# JONES, WARDEN, STONE MOUNTAIN CORRECTIONAL INSTITUTION *v.* HELMS

No. 80–850.  Argued April 28, 1981—Decided June 15, 1981

STEVENS, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, STEWART, WHITE, MARSHALL, POWELL, and REHNQUIST, JJ., joined. WHITE, J., filed a concurring opinion, *post*, p. 426. BLACK-MUN, J., filed an opinion concurring in the judgment, *post*, p. 427.

*Carol Atha Cosgrove,* Assistant Attorney General of Georgia, argued the cause for appellant. With her on the briefs were *Arthur K. Bolton,* Attorney General, *Robert S. Stubbs II,* Executive Assistant Attorney General, *Don A. Langham,* First Assistant Attorney General, *John C. Walden* and *Michael J. Bowers,* Senior Assistant Attorneys General, and *Nicholas G. Dumich,* Assistant Attorney General.

*James C. Bonner, Jr.,* argued the cause for the appellee. With him on the brief was *Robert D. Peckham.*

JUSTICE STEVENS delivered the opinion of the Court.

In Georgia, a parent who willfully and voluntarily abandons his or her dependent child is guilty of a misdemeanor. Those parents who commit that offense within Georgia and thereafter leave the State are guilty of a felony. The question presented by this appeal is whether this statutory classification violates the Equal Protection Clause of the Fourteenth Amendment.[1]

---

[1] The Fourteenth Amendment provides, in part:

"No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

As the case comes to us, the critical facts are not in dispute. In 1976, appellee pleaded guilty in Georgia to the felony of abandoning his child and leaving the State.[2]  By that plea, appellee formally admitted that he had willfully and voluntarily abandoned his daughter, leaving her in a dependent condition, before he left the State of Georgia.[3]  He received a 3-year prison sentence which he began to serve in 1978.[4]

---

[2] Appellee pleaded guilty to a charge that he had violated Ga. Code § 74–9902 (Supp. 1980), the statute at issue in this case.  Section 74–9902 (a) provides, in part:

"If any father or mother shall wilfully and voluntarily abandon his or her child, either legitimate or illegitimate, leaving it in a dependent condition, he or she, as the case may be, shall be guilty of a misdemeanor: Provided, however, if any father or mother shall wilfully and voluntarily abandon his or her child, either legitimate or illegitimate, leaving it in a dependent condition, and shall leave this State, or if any father or mother shall wilfully and voluntarily abandon his or her child, either legitimate or illegitimate, leaving it in a dependent condition, after leaving this State, he or she, as the case may be, shall be guilty of a felony . . . ."

[3] Appellee previously had separated from his wife and had been ordered to pay to her $150 a month for the support of their minor daughter.  It was stipulated that without making any such payments, appellee, "who by then had lost his property in Georgia, left the State and moved back to his native State, Alabama."  App. 16.  Appellee went to Alabama to pursue certain vocational training opportunities not available to him in Georgia.  He did not make child support payments while in Alabama. Appellee remained in Alabama until February 1976 when, while visiting his daughter in Georgia, he was arrested for his continuous failure to pay child support.  *Id.*, at 16–17.  Shortly thereafter, appellee was formally charged by a Georgia grand jury with a felony violation of § 74–9902. App. 3–4.

[4] Initially, appellee received a 3-year suspended sentence conditioned upon his paying $200 per month as support for his child during her minority.  *Id.*, at 8.  He again left the State without making any such payments, first residing in Alabama and thereafter in Florida.  In 1977, his estranged wife was murdered, and appellee gained custody of his daughter in Florida for a brief period of time.  Ultimately, appellee moved back to Georgia, and was rearrested for his failure to pay child support. *Id.*, at 17–19.  After a hearing, an order was entered enforcing his suspended sentence of imprisonment for a period of three years.  *Id.*, at 10.

After exhausting his state remedies,[5] appellee filed a petition for a writ of habeas corpus in the United States District Court for the Middle District of Georgia. He claimed that § 74–9902, by providing for enhanced punishment of those parents who left Georgia after abandoning their children, violated the Equal Protection Clause and the Privileges and Immunities Clause of Art. IV, § 2. See App. 22–23. The District Court denied relief, see *id.*, at 28–29, but the United States Court of Appeals for the Fifth Circuit reversed. See 621 F. 2d 211 (1980).[6]

The Court of Appeals held that the statute should be subjected to strict scrutiny because it infringed the fundamental right to travel.[7] Applying strict-scrutiny analysis, the court

---

[5] Appellee took no direct appeal from his initial felony conviction. However, in November 1978, after his suspended sentence had been revoked, he sought a writ of habeas corpus in the De Kalb Superior Court. Appellee claimed that the statute under which he had been convicted and sentenced violated both the Equal Protection Clause of the Fourteenth Amendment and the Privileges and Immunities Clause of Art. IV, § 2, of the United States Constitution because it authorized enhanced punishment based solely upon the exercise of the constitutional right to travel interstate and to reside outside the State of Georgia. After an evidentiary hearing, the state habeas court denied relief and ordered appellee remanded to custody. App. 11–15. The Supreme Court of Georgia denied appellee's application for a certificate of probable cause to appeal. *Id.,* at 20.

[6] During the pendency of his appeal from the District Court's order, appellee was released from custody. As the Court of Appeals noted, 621 F. 2d, at 212, n. 2, appellee's release did not moot his claim. See *Carafas* v. *LaVallee,* 391 U. S. 234, 237–240.

[7] The Court of Appeals analyzed the statutory classification, as follows: "The statute thus creates two classes of crimes, the first a misdemeanor for child abandonment within the State, the second a felony for leaving the State after abandonment or abandonment after leaving the State. Those outside Georgia, merely by their presence outside the State, are exposed to risk of a felony conviction while Georgia residents are exposed only to risk of a misdemeanor conviction for the same actions. We find the fundamental right to travel is infringed by this classification system." 621 F. 2d, at 212 (footnote omitted).

416

concluded that the state interests served by the statute, although legitimate, could be adequately protected by less drastic means; the statute therefore was invalid.[8] In the judgment of the Court of Appeals, the State's interest in extraditing offending parents, as well as its interest in requiring parents to support their children, was adequately served by the remedies provided in the Uniform Reciprocal Enforcement of Support Act (URESA), a version of which had been enacted in Georgia. See Ga. Code § 99–901a *et seq.* (1978 and Supp. 1980).[9] Moreover, because the Court of Appeals understood the statute not to require any proof of criminal intent, it considered this feature a further indication of the statute's unconstitutional overbreadth.[10]

---

[8] The Court of Appeals concluded that the statutory discrimination was not justified by a compelling state interest:

"We therefore find no sufficiently compelling state interest here which permits distinguishing between nonsupporting parents within or without the State of Georgia. There is no question that the statute violates equal protection. Further, even where a governmental purpose is legitimate, as here, the 'purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved.'" *Id.*, at 213 (footnote omitted).

[9] According to the Court of Appeals, the URESA adequately served the state interests § 74–9902 was designed to further:

"Georgia argues that the compelling state interests here are (1) the greater ease in extraditing persons accused of felonies than those accused of misdemeanors and (2) the protection of the State's fiscal integrity by the resulting enforcement of required parental child support. These arguments are unpersuasive since Georgia has in place, through its adoption of the Uniform Reciprocal Enforcement of Support Act (URESA), Ga. Code Ann. § 99–9A, et seq., an alternative means of enforcing child support obligations. Fiscal integrity of the State, support of minor children, and extradition of the nonpaying parent are all protected by this Act." 621 F. 2d, at 212–213 (footnotes omitted).

[10] As the Court of Appeals read § 74–9902, a felony conviction could be secured without any showing by the State that the abandoning parent had acted with criminal intent:

"The failure of the statute to require criminal intent as an element necessary for conviction is further indication of its overbreadth. Under

The Warden appealed, and we noted probable jurisdiction. 449 U. S. 1122. In an opinion issued several months prior to the Court of Appeals' decision, the Georgia Supreme Court had upheld the felony provision of § 74–9902 against an almost identical constitutional challenge. See *Garren* v. *State*, 245 Ga. 323, 264 S. E. 2d 876 (1980). We now resolve this conflict between the Georgia Supreme Court and the Court of Appeals by reversing the judgment of the Court of Appeals.

## I

The Court of Appeals' conclusion that § 74–9902 is constitutionally invalid rests entirely on the premise that the statute impairs the fundamental right of every Georgia resident to travel from Georgia to another State.[11] It is, of

the provision a person leaving the State fully intending to support his or her children, but unable to do so, commits a felony. A series of noncriminal acts can thus become a crime under the statute, subjecting the nonresident to extradition and felony conviction." 621 F. 2d, at 213 (footnote omitted).

Although the Court of Appeals' understanding of the statute was correct insofar as its comments concerned the mental state of the parent at the time of his or her departure from the State, the court appears to have overlooked the statutory requirement that the offending parent have "wilfully and voluntarily" abandoned his or her child. See n. 2, *supra.* As appellant points out, under Georgia law both desertion—*i. e.*, the willful forsaking and desertion of the duties of parenthood—and dependency—*i. e.*, leaving the child without necessaries—are elements of the offense of child abandonment under § 74–9902. See *Waites* v. *State,* 138 Ga. App. 513, 514, 226 S. E. 2d 621, 622 (1976). Because the State must establish that the desertion was willful, the Court of Appeals erred in suggesting that "[a] series of noncriminal acts can thus become a crime under the statute."

[11] It should be noted that this case involves only an abandonment by a resident parent within the State of Georgia, followed by the abandoning parent's departure from the State. Section 74–9902 also purports to define as a felony an abandonment by a parent who is not a resident of Georgia. See n. 2, *supra.* Although the Court of Appeals appears to have considered this aspect of the statute of some significance, see 621

course, well settled that the right of a United States citizen to travel from one State to another and to take up residence in the State of his choice is protected by the Federal Constitution. Although the textual source of this right has been the subject of debate, its fundamental nature has consistently been recognized by this Court. See *Shapiro* v. *Thompson,* 394 U. S. 618, 629–631; *United States* v. *Guest,* 383 U. S. 745, 757–759. The right to travel has been described as a privilege of national citizenship,[12] and as an aspect of liberty that is protected by the Due Process Clauses of the Fifth

_____

F. 2d, at 212, and appellee emphasizes it in his argument here, we express no opinion on the validity of such an application of § 74–9902. See *In re King,* 3 Cal. 3d 226, 474 P. 2d 983 (1970).

[12] In *Edwards* v. *California,* 314 U. S. 160, the Court held that the Commerce Clause required the invalidation of state statutes designed to restrict interstate migration. Justice Douglas, joined by Justice Black and Justice Murphy, agreed with the Court's judgment, but preferred to rely upon the Privileges and Immunities Clause of the Fourteenth Amendment as the source of the right to travel:

"The right to move freely from State to State is an incident of *national* citizenship protected by the privileges and immunities clause of the Fourteenth Amendment against state interference. Mr. Justice Moody in *Twining* v. *New Jersey,* 211 U. S. 78, 97, stated, 'Privileges and immunities of citizens of the United States . . . are only such as arise out of the nature and essential character of the National Government, or are specifically granted or secured to all citizens or persons by the Constitution of the United States.' And he went on to state that one of those rights of *national* citizenship was 'the right to pass freely from State to State.' *Id.,* at 97." *Id.,* at 178 (Douglas, J., concurring) (emphasis and ellipsis in original).

Justice Jackson was of essentially the same view. See *id.,* at 182–184 (concurring opinion).

It also should be noted that earlier decisions, beginning with *Corfield* v. *Coryell,* 6 F. Cas. 546 (No. 3,230) (CCED Pa. 1825) (Washington, J., Circuit Justice), suggested that the right to travel was a privilege and immunity of national citizenship protected by the Privileges and Immunities Clause of Art. IV. See *United States* v. *Guest,* 383 U. S. 745, 764–767 (opinion of Harlan, J.). In fact, appellee relied upon Art. IV in both his state and federal habeas corpus petitions. See n. 5, *supra; supra,* at 415.

and Fourteenth Amendments.[13] Whatever its source, a State may neither tax nor penalize a citizen for exercising his right to leave one State and enter another.

Despite the fundamental nature of this right, there nonetheless are situations in which a State may prevent a citizen from leaving. Most obvious is the case in which a person has been convicted of a crime within a State. He may be detained within that State, and returned to it if he is found in another State. Indeed, even before trial or conviction, probable cause may justify an arrest and subsequent temporary detention. Similarly, a person who commits a crime in a State and leaves the State before arrest or conviction may be extradited following "a summary and mandatory executive proceeding." [14] Manifestly, a person who has committed an offense against the laws of Georgia may be stopped at its borders and temporarily deprived of his freedom to travel elsewhere within or without the State.[15]

---

[13] At the beginning of this century, Chief Justice Fuller, in dictum, identified the Fourteenth Amendment as a source of the right to travel:

"Undoubtedly the right of locomotion, the right to remove from one place to another according to inclination, is an attribute of personal liberty, and the right, ordinarily, of free transit from or through the territory of any State is a right secured by the Fourteenth Amendment and by other provisions of the Constitution." *Williams* v. *Fears*, 179 U. S. 270, 274.

In his dissenting opinion in *Shapiro* v. *Thompson*, 394 U. S. 618, 671, Justice Harlan concluded that "the right to travel interstate is a 'fundamental' right which, for present purposes, should be regarded as having its source in the Due Process Clause of the Fifth Amendment." See also *United States* v. *Guest*, 383 U. S., at 757–759; *id.*, at 769–770 (opinion of Harlan, J.).

[14] *Michigan* v. *Doran*, 439 U. S. 282, 288.

[15] In his concurring opinion in *Edwards* v. *California, supra*, Justice Jackson explained this limitation on the right to travel:

"The right of the citizen to migrate from state to state which, I agree with Mr. Justice Douglas, is shown by our precedents to be one of national citizenship, is not, however, an unlimited one. In addition to being sub-

In this case, appellee's guilty plea was an acknowledgment that he had committed a misdemeanor before he initially left Georgia for Alabama. Upon conviction of that misdemeanor, he was subject to imprisonment for a period of up to one year.[16] Therefore, although he was not convicted of abandonment until after his first trip to Alabama, appellee's own misconduct had qualified his right to travel interstate before he sought to exercise that right. We are aware of nothing in our prior cases or in the language of the Federal Constitution that suggests that a person who has committed an offense punishable by imprisonment has an unqualified federal right to leave the jurisdiction prior to arrest or conviction.

This case differs in a significant respect from prior cases involving the validity of state enactments that were said to penalize the exercise of the constitutional right to travel. In the first decision squarely to recognize the right to travel, *Crandall* v. *Nevada,* 6 Wall. 35, the Court held that a State may not impose a tax on residents who desire to leave the State, nor on nonresidents merely passing through. In *Edwards* v. *California,* 314 U. S. 160, the Court held that a State may not make it a crime to bring a nonresident indigent person into the State. In more recent decisions, the Court has examined state statutes imposing durational residence requirements that deprived new residents of rights or benefits available to old residents, to determine whether such requirements penalized citizens for exercising their constitutional

---

ject to all constitutional limitations imposed by the federal government, such citizen is subject to some control by state governments. He may not, if a fugitive from justice, claim freedom to migrate unmolested, nor may he endanger others by carrying contagion about. These causes, and perhaps others that do not occur to me now, warrant any public authority in stopping a man where it finds him and arresting his progress across a state line quite as much as from place to place within the state." 314 U. S., at 184.

[16] See Ga. Code § 27–2506 (1978).

right to travel.[17]   In all of those cases, the statute at issue imposed a burden on the exercise of the right to travel by citizens whose right to travel had not been qualified in any way.   In contrast, in this case, appellee's criminal conduct within the State of Georgia necessarily qualified his right thereafter freely to travel interstate.   Appellee's claim is therefore on a different footing from the claims at issue in *Crandall, Edwards,* and the durational residence requirement cases.[18]

---

[17] In *Dunn* v. *Blumstein,* 405 U. S. 330, 334, we explained the problem presented by durational residence requirements:

"Durational residence laws penalize those persons who have traveled from one place to another to establish a new residence during the qualifying period.   Such laws divide residents into two classes, old residents and new residents, and discriminate against the latter . . . ."

We have invalidated durational residence requirements that operated to deprive new residents of the right to vote, *Dunn, supra,* and of welfare and medical care benefits. See *Shapiro* v. *Thompson, supra; Memorial Hospital* v. *Maricopa County,* 415 U. S. 250.   However, even though durational residence requirements necessarily impinge to some extent on the right to travel, they are not automatically invalid. *Memorial Hospital, supra,* at 256. See, *e. g., Sosna* v. *Iowa,* 419 U. S. 393; cf. *Vlandis* v. *Kline,* 412 U. S. 441, 452–453.

[18] In its decision sustaining the validity of § 74–9902, the Georgia Supreme Court recognized this distinction:

"There is an entirely obvious difference, on the one hand, between an attempt by a 'receiving state' to preclude or discourage inward migration from 'sending states' of persons deemed by the 'receiving state' to be 'undesirables,' 'non-contributors' or 'economically burdensome persons,' and efforts, as in the present case, by a 'sending state' to bring persons accused of crimes back from 'receiving states' to face criminal trial and punishment in the 'sending state.'   Persons, including indigents and other migrants, have a right of free travel. . . . On the other hand, persons charged with the commission of crimes shall be delivered up to the state having jurisdiction of the crime. . . .   A person charged in Georgia with commission of a crime who has left Georgia and entered another state cannot be said to have a constitutionally protected right of free travel in interstate commerce that can be asserted to bar prosecution for

These precedents are inapposite for another reason as well. The question presented by this case is not whether Georgia can justify disparate treatment of residents and nonresidents,[19] or of new and old residents.[20] Rather, the question is whether the State may enhance the misdemeanor of child abandonment to a felony if a resident offender leaves the State after committing the offense. Presumably the commission of the misdemeanor of child abandonment would not justify a permanent restriction on the offender's freedom to leave the jurisdiction. But a restriction that is rationally related to the offense itself—either to the procedure for ascertaining guilt or innocence, or to the imposition of a proper punishment or remedy—must be within the State's power. Thus, although a simple penalty for leaving a State is plainly impermissible,[21] if departure aggravates the consequences of conduct that is otherwise punishable, the State may treat the

the Georgia offense." *Garren* v. *State,* 245 Ga. 323, 324–325, 264 S. E. 2d 876, 877–878 (1980) (citations omitted).

The California Supreme Court recognized the same distinction in an opinion upholding a statute that tolled the statute of limitations for criminal offenses during the time the defendant was outside the State: "[T]here is clearly a distinction between one who, like defendant, leaves the state after committing a crime, resulting in the tolling of the statute of limitations during his absence, and one who has committed no crime but is deprived of a government benefit merely because he exercises his right to travel to another state. In the former circumstance, the state has an interest in assuring that the defendant is available locally not only to enhance the possibility of detection but also to avoid the burdens of extradition proceedings, should he be charged, his whereabouts become known, and he refuses to return voluntarily." *Scherling* v. *Superior Court of Santa Clara County,* 22 Cal. 3d 493, 501, 585 P. 2d 219, 223–224 (1978).

[19] See n. 11, *supra.*

[20] The latter variety of disparate treatment was primarily at issue in cases such as *Shapiro* v. *Thompson, Dunn* v. *Blumstein,* and *Memorial Hospital* v. *Maricopa County, supra.*

[21] Cf. *Crandall* v. *Nevada,* 6 Wall. 35; *Edwards* v. *California,* 314 U. S. 160.

entire sequence of events, from the initial offense to departure from the State, as more serious than its separate components.

The Georgia Supreme Court has held that § 74–9902's enhancement provision serves the "legislative purpose of causing parents to support their children since the General Assembly could have concluded that the parental support obligation is more difficult to enforce if the parent charged with child abandonment leaves the state." *Garren* v. *State,* 245 Ga., at 325, 264 S. E. 2d, at 878. There can be no question about the legitimacy of the purpose to cause parents to support their children.[22] And appellee has not provided us with any basis for questioning the validity of the legislative judgment that this purpose is served by making abandonment within the State followed by departure a more serious offense than mere abandonment within the State. We therefore are unwilling to accept the suggestion that this enhancement is an impermissible infringement of appellee's constitutional right to travel. Accordingly, we reject the premise on which the Court of Appeals' holding rests.

## II

Having rejected the claim that the Georgia statute impermissibly infringes on the constitutionally protected right to travel, we find no support for the conclusion that the statute violates the Equal Protection Clause. That Clause "announces a fundamental principle: the State must govern impartially. General rules that apply evenhandedly to all persons within the jurisdiction unquestionably comply with this principle." *New York City Transit Authority* v. *Beazer,* 440 U. S. 568, 587.

The Equal Protection Clause provides a basis for challenging legislative classifications that treat one group of persons

---

[22] Indeed, the Court of Appeals and appellee both acknowledged the legitimacy of the statute's purposes. See 621 F. 2d, at 213; Brief for Appellee 13–15.

as inferior or superior to others,[23] and for contending that general rules are being applied in an arbitrary or discriminatory way.[24] The portion of the Georgia statute at issue in this case applies equally to all parents residing in Georgia; nothing in appellee's argument or in the record suggests that the statute has been enforced against appellee any differently than it would be enforced against anyone else who engaged in the same conduct. By its terms, it does not subject "one caste of persons to a code not applicable to another," see n. 23, *supra,* nor has appellee shown that it has been arbitrarily or discriminatorily applied. Thus, neither on the face of § 74–9902, nor in its application to appellee, can we detect any violation of the constitutional requirement that the State's administration of its laws must be impartial and evenhanded. *New York City Transit Authority, supra.*

The characterization by the Court of Appeals and appellee of the Georgia statute as "overbroad" does not affect our conclusion. Appellee contends, and the Court of Appeals found, that Georgia has available less restrictive means to serve the legitimate purposes furthered by the felony provi-

[23] An effective expression of this point was made in the Senate debate preceding the adoption of the Fourteenth Amendment. Senator Howard stated:

"This abolishes all class legislation in the States and does away with the injustice of subjecting one caste of persons to a code not applicable to another.

.     .     .     .     .

It establishes equality before the law, and it gives to the humblest, the poorest, the most despised of the race the same rights and the same protection before the law as it gives to the most powerful, the most wealthy, or the most haughty. That, sir, is republican government, as I understand it, and the only one which can claim the praise of a just Government." Cong. Globe, 39th Cong., 1st Sess., 2766 (1866).

Most frequently, claims of denial of equal protection of the laws are asserted by the members of a class of persons easily defined by a characteristic such as race, sex, alienage, illegitimacy, or religion.

[24] See, *e. g., Yick Wo* v. *Hopkins,* 118 U. S. 356.

sion of § 74–9902. In particular, our attention is directed to the URESA, which is said to protect the State's interests in fiscal integrity, support of minor children, and extradition of abandoning parents.[25] The appellant argues at length that the URESA does not provide an adequate means of enforcing the support obligations of parents who abandon their children and leave the jurisdiction. Although, the appellant's argument is persuasive,[26] for purposes of deciding this case we need neither accept nor reject it. The Court of Appeals deemed the remedies available under the URESA significant because a legislative program that infringes upon fundamental rights in order to serve legitimate state ends must be the least restrictive means for achieving those ends.[27] However, because we have concluded that § 74–9902 does not infringe upon appellee's fundamental rights, this reasoning is inapplicable. In the context of this case, the State need not em-

[25] See n. 9, *supra.* Appellee also suggests that making all child abandonments felonies would serve Georgia's legitimate interests in a "less restrictive" fashion than § 74–9902. It is true that such a change would preclude appellee's claim that the statute is discriminatory, but it is not clear that such a statute would be less restrictive.

[26] A number of commentators have identified the same weaknesses in the enforcement mechanism established in the URESA as the appellant cites in his argument in this case. See, *e. g.,* Note, Interstate Enforcement of Support Obligations Through Long Arm Statutes and URESA, 18 J. Fam. Law 537, 541 (1980); Comment, Enforcement of Support Obligations: A Solution and Continuing Problems, 61 Ky. L. J. 322, 328–329 (1972). Cf. Chambers, Men Who Know They Are Watched: Some Benefits and Costs of Jailing for Nonpayment of Support, 75 Mich. L. Rev. 900 (1977).

[27] The Court of Appeals relied upon *Shelton* v. *Tucker,* 364 U. S. 479, for this proposition:

"[E]ven though the government purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved. The breadth of legislative abridgment must be viewed in the light of less drastic means for achieving the same basic purpose." *Id.,* at 488 (footnotes omitted).

ploy the least restrictive, or even the most effective or wisest, means to achieve its legitimate ends.

Similarly, we need neither agree nor disagree with appellee's argument that the statute is unnecessarily severe because it does not require that the act of leaving the State—as well as the act of abandonment—be motivated by a wrongful intent.[28] Because of this feature, the statute may well be unnecessarily broad. This is a matter, however, that relates to the wisdom of the legislation. It raises no question with respect to the uniform and impartial character of the State's law. It therefore does not implicate the fundamental principle embodied in the Equal Protection Clause of the Fourteenth Amendment.

Because we conclude that § 74–9902 did not penalize the exercise of the constitutional right to travel and did not deny appellee the equal protection of the laws, the judgment of the Court of Appeals is reversed.

*So ordered.*

JUSTICE WHITE, concurring.

In *Shapiro* v. *Thompson,* 394 U. S. 618 (1969), the Court held that restricting welfare benefits to those who had resided in a State for at least one year penalized the exercise of the constitutional right to travel from State to State and that because it did so, the discrimination against newly arrived residents had to be justified by a compelling state interest to avoid violating the Equal Protection Clause. Such an interest was not found. It seemed to me at the time, and it seems to me now, that the same result would have obtained in that case without implicating the Equal Protection Clause at all, given the Court's view of the relationship between the restriction on travel and the State's justifying interests. As

---

[28] The Court of Appeals considered the statute's failure to require that the act of leaving the State be accompanied by criminal intent a significant defect. See *supra,* at 416, and n. 10.

JUSTICE STEWART said in concurrence, any purpose "offered in support of a law that so clearly impinges upon the constitutional right of interstate travel must be shown to reflect a *compelling* governmental interest." *Id.,* at 643–644. In reaching its conclusion, the Court could as well have said that the proffered state interests did not justify the deterrent effect on the right to travel. Had it found those interests sufficient to warrant the residency requirement, however, the equal protection argument would also have been without force because the reason for insisting upon more than a rational basis for the requirement would have disappeared.

As I understand it, this is essentially the approach followed by the Court today: it first finds that whatever restriction on interstate travel is imposed by the challenged Georgia provision, the State's interest in enforcing its child support laws is sufficient to justify the restriction. The opinion then finds that the equal protection claim is without substance because there is at least a rational basis for the State's classification.

I join the Court's opinion and judgment.

JUSTICE BLACKMUN, concurring in the judgment.

No one disputes that the State of Georgia can designate the crime of willful child abandonment a felony. It instead has chosen to make the crime a misdemeanor if confined within state boundaries, but a felony once abandonment is accompanied by departure from the State. Thus, in effect, the State requires an abandoning and nonsupporting parent to remain in Georgia if he or she wishes to avoid more serious criminal penalties. This burden on interstate travel applies even if the parent has no criminal intent when crossing the state line.

Given the Georgia statutory scheme, § 74–9902 (a) clearly penalizes appellee's exercise of his constitutional right to travel. In my view, however, that penalty is justified by the State's special interest in law enforcement in this context. The challenged criminal statute is concerned primarily with

restitution rather than punishment, and the core criminal conduct, willful abandonment and continuing nonsupport, is markedly more difficult to redress once the offending parent leaves the jurisdiction. A restriction that reasonably discourages departure may therefore be justified as tailored to further the precise remedial objective of the criminal law. Significantly, however, the objective advanced here is not identical to the more general goal of improving the administration of criminal justice. The Court perhaps has this distinction in mind when it concludes, *ante,* at 422, that where departure "aggravates the consequences of conduct that is otherwise punishable," it may merit enhanced punishment. I doubt that a State constitutionally may impose greater penalties for all crimes simply because the accused leaves the jurisdiction. To hold otherwise ignores the availability of summary interstate transfer procedures under the Extradition Clause, and chills unacceptably the travel rights of the presumptively innocent citizen.

For me, it also is noteworthy that appellee pleaded guilty to the crime of willful abandonment and subsequent departure from the State. The record gives no indication that appellee was anything but aware that his crime would become more serious once he left Georgia. Thus, the Court today need not decide the constitutionality of this statute as applied to a person of ordinary intelligence who had no knowledge, or reason to know, that the protected act of interstate travel would convert him from a misdemeanant into a felon. Cf. *Lambert* v. *California,* 355 U. S. 225 (1957).

I concur in the judgment.