**James K. EATON, Mary Ann Eaton, Douglas Brown and Connie Thompson, Plaintiffs,**

v.

**Richard E. LYNG, in his official capacity as Secretary of the United States Department of Agriculture, and Nancy A. Norman, in her official capacity as Commissioner of the Iowa Department of Human Services, Defendants.**

No. C 87–4073.

United States District Court, N.D. Iowa, W.D.

June 29, 1987.

Thomas A. Krause, Dennis McElwain, Sioux City, Martin J. Ozga, Des Moines, Iowa, for plaintiffs.

Dan W. Hart, Des Moines, Iowa, James A. Gardner, Sheila Lieber, Washington, D.C., for defendants.

DONALD E. O'BRIEN, Chief Judge.

This matter comes to the Court on plaintiffs' resisted motion for a preliminary injunction, a motion to stay proceedings filed by Defendant Lyng and joined by Defendant Norman, and a subsequent motion to dismiss filed by Defendant Lyng and joined by Defendant Norman.[1]  Defendant Norman has also filed a motion to join Local 1142 of the United Food and Commercial Workers as a necessary and indispensable party under Rule 19.  This motion will be ruled upon in a separate order.  The Court has considered these motions in telephonic hearings in which all parties were represented.  For the reasons stated below, the Court finds that the plaintiffs have failed to state a claim upon which relief may be granted and cannot show the substantial likelihood of success on the merits which is necessary to warrant a preliminary injunction.  Therefore, the plaintiffs' motion must be denied, and the defendants' motion to dismiss is granted.

The plaintiffs challenge the constitutionality of a 1981 amendment to the Food Stamp Act of 1977 which precludes a household from becoming eligible for food stamps if a member of that household is on strike and that household would not have

---

1.  Defendant Lyng initially filed the motion to stay proceedings pending the Supreme Court's decision in *Lyng v. International Union, United Automobile, Aerospace, and Agricultural Implement Workers, prob. juris. noted,* —— U.S. ——, 107 S.Ct. 1970, 95 L.Ed.2d 811 (1987).  This Court believes it would be a disservice to the parties in this case to refuse to rule on a request for emergency relief in a case in which the plaintiffs are clearly suffering irreparable harm, especially when the Supreme Court may not rule until July 1988.  The motion to stay is therefore denied.

been eligible prior to the strike.[2] Under this amendment, which was enacted as § 109 of the Omnibus Budget Reconciliation Act of 1981, Public Law No. 97–35, 95 Stat. 361, households which include a striker are evaluated on the basis of their income immediately prior to the strike, and decreases in income during a strike will not entitle such households to an increased allotment. A USDA regulation defines "striker" and establishes a formula for calculating pre-strike income. 7 C.F.R. § 273.1(g) (1987).

The report of the Senate Committee on Agriculture, Nutrition and Forestry which accompanied the amendment is the best evidence of its purposes:

Granting benefits to strikers can be seen as encouragement to workers to "wait out" management rather than compromise....

Denying benefits (or denying increased benefits) to households containing members on strike is consistent with the underlying policy of tying receipt of food stamps to the ability and willingness to work, as exemplified by provisions requiring work registration, denying benefits to those voluntarily quitting a job without good cause, and allowing the establishment of workfare programs.

A person who leaves his job to go on strike has given up the income from the job of his own volition. A person making such a choice and participating in a strike must bear the consequences of his decision without assistance from the food stamp program.

S.Rep. No. 139, 97 Cong., 1st Sess. 62, reprinted in 1981 U.S.Cong. & Admin.News 396, 452.

Plaintiffs James Eaton and Doug Brown are employees of John Morrell & Company's Sioux City plant and are members of Local 1142 of the United Food and Commercial Workers, which struck the Sioux City plant on or about March 9, 1987. (Exhibit 1 at 1, Exhibit 4 at 1). Plaintiff Mary Ann Eaton is the wife of James Eaton, and the Eatons have two children. Robert Kammerer, an income-maintenance supervisor for the Iowa Department of Human Services, testified that the Eatons applied for food stamps on February 23, 1987. On April 21, 1987, the Iowa Department of Human Services issued a Notice of Decision finding the Eatons eligible for $25.00 per month in food stamps. Under the "strikers amendment", this finding was reached on the basis of pre-strike income. But for the strikers amendment, the Eaton family would have been eligible for a monthly allotment of $268.00, the maximum allotment for a family of four.

James Eaton believes he would be able to stay out on strike longer with a full food stamp allotment. He stated that he has been thinking a lot about leaving his family so that they could obtain food stamps and AFDC benefits, and that he would leave them rather than return to work at Morrell during the strike. Mr. Eaton believes he would lose his union membership if he crosses the picket line and returns to work at Morrell, and does not believe he could transfer to another work place represented by the UFCW union. (Exhibit 2).

Plaintiffs Doug Brown and Connie Thompson reside together in an apartment, but are having trouble making rent payments. Mr. Kammerer testified that the couple has been denied food stamps altogether. In a recent affidavit, Mr. Brown

**2.** This provision, codified at 7 U.S.C. § 2015(d)(3), states in full:

Notwithstanding any other provision of law, a household shall not participate in the food stamp program at any time that any member of such household, not exempt from the work registration requirements of paragraph 1 of this subsection, is on strike as defined in section 142(2) of Title 29, because of a labor dispute (other than a lockout) as defined in section 152(9) of Title 29: *provided*, that a household shall not lose its eligibili-

ty to participate in the food stamp program as a result of its members going on strike if the household was eligible for food stamps immediately prior to such strike, however, such household shall not receive an increased allotment as a result of a decrease in the income of the striking member or members of the household: *provided further*, that such ineligibility shall not apply to any household that does not contain a member on strike, if any of its members refuses to accept employment at a plant or site because of a strike or lockout.

stated that he would have to move out of the apartment and live in his car, and Thompson would have to move in with her parents. He also believes that he would lose his union membership if he returned to work at Morrell and does not believe that he could transfer to another UFCW work place. (Supplemental Affidavit of Doug Brown at 2).

The plaintiffs allege that the strikers amendment is unconstitutional under the First Amendment and the substantive due process and equal protection components of the Fifth and Fourteenth Amendments. They contend that the strikers amendment is a penalty imposed upon them in an attempt to stifle their rights to free speech and association by tearing apart the families of strikers. They assert that the law violates the First Amendment because it infringes upon their rights to associate with their families and their union without being the least restrictive means to achieving a compelling governmental interest. In the alternative, they assert that the law denies due process and equal protection because it creates arbitrary and irrational legislative classifications. They seek a preliminary injunction on this basis.

Defendant Richard Lyng's Department of Agriculture jointly administers the food stamp program in Iowa with Defendant Nancy Norman's Iowa Department of Human Services. Lyng's department pays for benefits and at least half of the administrative costs of the program; Norman's department pays for a portion of the administrative costs. 7 U.S.C. § 2025(a). Each defendant asserts that, as a matter of law, the strikers amendment does not violate any of the plaintiffs' constitutional rights and each has moved to dismiss the plaintiffs' claims under Rule 12(b)(6) on this basis.

In deciding whether the strikers amendment is unconstitutional, the Court has the benefit of previous rulings on this precise question by two well-respected district court judges—Judge Louis Oberdorfer's rulings in *International Union, United Automobile, Aerospace and Agricultural Implement Workers v. Lyng*, 648 F.Supp. 1234 (D.D.C.1986), *prob. juris. noted*, —— U.S. ——, 107 S.Ct. 1970, 95 L.Ed.2d 811 (1987), and Judge Richard Enslen's unpublished decision in *Ledesma v. Block*, No. G82–94 (W.D.Mich.1985), *appeal pending*, No. 85–1730 (6th Cir.1987).[3] Unfortunately, these judges reached opposite conclusions; the law was upheld in *Ledesma* and declared unconstitutional in *UAW*. While the Supreme Court will resolve this conflict during its next term, the plaintiffs seek emergency relief and deserve an expedited ruling from this Court.

*The Plaintiffs' First Amendment Claim*

■ The plaintiffs' First Amendment theory is nearly identical to the theory underlying the *UAW* decision. The *UAW* court held that the strikers amendment may "confront a striker with a complex associational dilemma." 648 F.Supp. at 1252. A striker can improve his family's lot by (1) crossing a picket line and returning to work, (2) successfully pressuring his union to reach a settlement, (3) quitting his job and finding work elsewhere, or (4) leaving his family and forming a separate household. The plaintiffs believe that the first and third alternatives would require them to disassociate with their union, that the second would require them to suppress their protected expressions of support for the strike, and that the fourth alternative would require them to disassociate themselves from their families. Because no alternative exists which would permit strikers to receive food stamps for poverty resulting from the strike without

---

**3.** In a third case involving the strikers' amendment, a union did not challenge the constitutionality of the strikers amendment itself, but only contended that it was being enforced in an unconstitutional manner. *United Steelworkers v. Block*, 578 F.Supp. 1417, 1421–24 (D.S.D. 1982), *aff'd on other grounds, United Steelworkers v. Johnson*, 799 F.2d 402 (8th Cir.1986), *reh'g*

granted, 804 F.2d 440 (8th Cir.1987). The district court found that in the special circumstances of that case, it lacked jurisdiction to hear it. Although the district court chose to address the constitutionality of the statute anyway and found it constitutional, the Eighth Circuit panel has described this portion of the district court' decision as dicta. 799 F.2d at 404.

waiving these constitutional rights, the *UAW* court held that the amendment must be given the closest scrutiny, and permitted only if the government could demonstrate a substantial or compelling interest which could not be narrowly accommodated. 648 F.Supp. at 1253. Because the government's objectives could be advanced by a more carefully tailored law, the *UAW* court found the statute unconstitutional.

The parties do not appear to disagree about which activities are protected by the First Amendment. The rights of citizens to associate with each other in unions and to organize for political and social action are protected by the First Amendment. *Smith v. Arkansas State Highway Employees*, 441 U.S. 463, 464, 99 S.Ct. 1826, 1827, 60 L.Ed.2d 360 (1979). The rights of citizens to associate with their families and choose particular family living arrangements are also protected. *Zablocki v. Redhail*, 434 U.S. 374, 386–87, 98 S.Ct. 673, 681, 54 L.Ed.2d 618 (1978); *Moore v. City of East Cleveland*, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977). The real dispute in this case concerns the meaning of the First Amendment protection. The plaintiffs emphasize that the strikers amendment is the "proximate cause" of the dilemma which pressures them to disassociate with their union or families, and rely upon the *UAW* decision, which held that "any state action having such effect of curtailing the right to associate should be subject to the closest scrutiny." 648 F.Supp. at 1253. Defendant Lyng responds that the amendment is simply a refusal to fund the decision to strike or to fund protected activity, and contends that the constitutional protection for the right to associate does not impose a duty to fund its exercise.

A fine line exists between the defendants' constitutional obligation to refrain from actions which produce the same result as a direct prohibition of the exercise of a right and their prerogative to merely refuse to subsidize the exercise of rights.

> It would be a palpable incongruity to strike down an act of state legislation which, by words of express divestment, seeks to strip the citizen of rights guaranteed by the federal constitution, but to uphold an act by which the same result is accomplished under the guise of a surrender of a right in exchange for a valuable privilege which the state threatens otherwise to withhold.

*Frost & Frost Trucking Co. v. Railroad Commission*, 271 U.S. 583, 593–94, 46 S.Ct. 605, 607, 70 L.Ed. 1101 (1926). For this reason, conditions on the receipt of public benefits which restrict an award to those who give up a constitutional right are generally unconstitutional. Thus, in *Speiser v. Randall*, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958), the Supreme Court struck down a California statute under which veterans who opposed the existing form of government could receive greater tax benefits by stifling their opposition. In *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), the Supreme Court struck down a South Carolina restriction on unemployment compensation eligibility which disqualified persons who would not work on Saturday, and thereby rewarded those Sabattarians who gave up their right to worship on Saturday or changed faiths. In each case, the law created an improper incentive to give up a right.

However, the Supreme Court has refused to extend this doctrine to cases in which the pressure or incentive to give up a right is not created by the law, but by other forces. In *Maher v. Roe*, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977), and *Harris v. McRae*, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980), the Supreme Court upheld state and federal Medicaid provisions which withheld public financing for the costs of certain types of abortions. In each case the court reiterated that the plaintiffs had a constitutional right to choose whether or not to terminate a pregnancy. However, because the laws in question did not place any obstacles in a pregnant woman's path to an abortion, they did not impermissibly impinge upon that constitutional right. *Maher*, 432 U.S. at 474, 97 S.Ct. at 2382; *Harris*, 448 U.S. at 316, 100 S.Ct. at 2687. Thus, even if the associational dilemma described by the *UAW* court would not occur

if Congress had not enacted the strikers amendment, that does not make the law unconstitutional if the law does not also create an obstacle to the exercise of a right or an incentive to give up a right.

The two most restrictive alternatives open to strikers—crossing the picket line to return to work at Morrell and stifling their opposition to the strike in order to induce a settlement—do not result from any obstacle or incentive created by Congress or the defendants. Because strikers cannot increase their food stamp allotment by taking either path, the defendants cannot be accused of rewarding those who choose either alternative. Strikers who cross picket lines or press their leaders to settle do so because they need paychecks. The indigency which causes them to need paychecks so desperately is not *created* by Congress or the defendants. It is created by the strike, and Congress has simply refused to use the food stamp program to solve the problem.

The families of workers who choose either of the two other alternatives—moving out of the household and quitting their job—may receive additional food stamps, but the cost of taking each route should nearly always outweigh the value of the additional food stamps. If a striker leaves his household, those who remain are no longer subject to the strikers amendment. But as the Supreme Court noted in *Lyng v. Castillo*, 477 U.S. 635, 106 S.Ct. 2727, 2730, 91 L.Ed.2d 527 (1986), "it is exceedingly unlikely that close relatives would choose to live apart simply to increase their allotment of food stamps, for the cost of separate housing would almost certainly exceed the incremental value of the additional stamps." [4] Similarly, employees who quit their jobs on the eve of a strike are not indefinitely disqualified, and may become eligible after ninety days. 7 C.F.R. § 273.-

7(h)(2)(iii) (1987). But this could only be an incentive to quit in a rare setting in which the strike is likely to exceed ninety days *and* the value of food stamps exceeds the seniority and benefits which would be lost by quitting. Thus, the defendants have not created a genuine incentive to choose any of the alternatives which would require a waiver of a constitutional right. Congress has merely refused to provide relief from the social and economic pressures to choose those alternatives. Under *Maher* and *Harris*, this is constitutional.

The plaintiffs correctly note that this case is distinguishable from *Maher* and *Harris* in one important respect. In those cases the exception was carefully tailored so that only the protected activity itself was not funded; the patient was not disqualified from all Medicaid eligibility as a result of her abortion, and her family's eligibility was not affected. In this case, the defendants are not simply deducting the cost of union dues from the plaintiffs' allotment; they are disregarding any drop in income following the strike and this affects the eligibility of the strikers' entire household. For these reasons, the plaintiffs assert that the strikers amendment is not simply a refusal to subsidize protected activity, but is a penalty or broad disqualification of the sort criticized in footnote 8 of *Maher*, 432 U.S. at 474, 97 S.Ct. at 2383, and footnote 19 of *Harris*, 448 U.S. at 317, 100 S.Ct. at 2688.

The Court believes these footnotes prohibit the defendants from withholding all eligibility from those who would be eligible but for their decision to remain associated with the union. However, the strikers amendment does not condition eligibility for food stamps on a refusal to associate, or even a refusal to strike. [5] The families

---

4. This Court recognizes that in some circumstances, the cost of separate housing may not be as great as the Supreme Court presumes it would be. Strikers may move in with each other or with their parents, or may move into their cars. (See Supplemental Affidavit of Doug Brown). The ultimate legal question, however, is whether the government has made these options so attractive that it "directly and substantially" interferes with family relationships. *Zablocki v. Redhail*, 434 U.S. 374, 386–87, 98 S.Ct.

673, 681, 54 L.Ed.2d 618 (1978). Any incentive to leave one's family which the statute creates is not strong enough to meet the *Zablocki* standard.

5. The First Amendment protects the right to associate and the right of associations to engage in advocacy on behalf of their members. *Smith*, 441 U.S. at 464, 99 S.Ct. at 1827. However, it does not protect the right to strike. *UAW Local 232 v. Wisconsin Employee Relations*

of those strikers who were already eligible for food stamps prior to the strike remain eligible for that level of benefits during the strike—no more and no less. This is not the kind of "broad disqualification" criticized in the footnotes. If this can be construed as a penalty at all, it is a penalty for the unprotected activity of striking, rather than a penalty for the protected activities of association and free speech.

The plaintiffs have also argued that the amendment is a penalty because strikers are treated less favorably than workers who voluntarily quit, have defrauded the system or have been fired. Some forms of discriminatory treatment such as content-based discrimination and viewpoint-based discrimination are generally forbidden by the First Amendment. *Police Department of the City of Chicago v. Mosely*, 408 U.S. 92, 95–96, 92 S.Ct. 2286, 2289–90, 33 L.Ed.2d 212 (1972). However, the Court can find nothing in the First Amendment jurisprudence which prevents Congress from discriminating against persons who are unemployed due to collective action rather than discrete individual acts. The Supreme Court has previously upheld laws which treat strikers less favorably than those who are unemployed for other reasons. *Ohio Bureau of Employment Services v. Hodory*, 431 U.S. 471, 489, 97 S.Ct. 1898, 1908, 52 L.Ed.2d 513 (1977).

In summary, the strikers amendment does not create obstacles to the plaintiffs' exercise of their constitutional rights to free association and free speech. While incentives to give up those rights certainly exist, those incentives are not created by the strikers amendment. The law does not penalize persons for exercising those rights, and it does not discriminate on any basis forbidden by the First Amendment. Thus, the Court reluctantly agrees with the *Ledesma* decision and respectfully disagrees with the *UAW* decision, and holds that the strikers amendment does not violate the First Amendment.

### Plaintiffs' Fifth and Fourteenth Amendment Claims

■ In order to determine whether the strikers amendment constitutes a denial of due process or equal protection, the Court must first choose the proper level of scrutiny. Because strikers are not a suspect or semi-suspect class, the plaintiffs do not contend that the law should be given strict scrutiny solely on Fifth and Fourteenth Amendment grounds. However, many of the plaintiffs' criticisms of the strikers amendment, such as their contention that Congress' goals could be achieved by more narrowly tailored measures, are only significant if the court demands *more* than a rational relationship between the law and a legitimate governmental objective. *Jones v. Helms*, 452 U.S. 412, 425, 101 S.Ct. 2434, 2443, 69 L.Ed.2d 118 (1981). The *UAW* court used a heightened level of scrutiny because it found that strikers are a group which as a historical matter has been subjected to discrimination and because the law directs the onus of the striker's exercise of his associational rights upon innocent members of his family by disqualifying strikers' households.[6]

*Board*, 336 U.S. 245, 251, 69 S.Ct. 516, 520, 93 L.Ed. 651 (1949). "The economic activities of a group of persons (whether representing labor or management) who associate together to achieve a common purpose are not protected by the First Amendment. Such activities may be either prohibited or protected as a matter of legislative policy." *Hanover Township Federation of Teachers Local 1954 v. Hanover Community Schools*, 457 F.2d 456, 461 (7th Cir.1972) (per Stevens, J.).

**6.** In defending its heightened level of scrutiny, the *UAW* court also relied upon *United States Department of Agriculture v. Moreno*, 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973), in which the Supreme Court struck down an earlier definition of a "household" eligible for food stamps which excluded households containing one or more members who are unrelated to the rest, such as communal or "hippie" households. However, the *Moreno* court clearly used a rational basis test. *Lyng v. Castillo*, 106 S.Ct. at 2730 n. 3. The statute failed the test because the only goal to which the court could relate the exclusion was "a bare desire to harm a politically unpopular group...." 413 U.S. at 534, 93 S.Ct. at 2826. In this case, the defendants contend that the amendment is rational in spite of its harmful effect on strikers; they do not contend it is rational because it harms strikers. Thus, *Moreno* is distinguishable.

This Court believes that the historical mistreatment of strikers is not sufficient to warrant the kind of protection bestowed by the *UAW* court. The Supreme Court has already been presented with an opportunity to use a heightened standard of scrutiny to review laws singling out strikers and has failed to do so. *Ohio Bureau of Employment Services v. Hodory*, 431 U.S. at 489, 97 S.Ct. at 1908. Furthermore, as the Supreme Court recently held in *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985), groups which have been the subject of prejudice such as the mentally retarded are not entitled to protection as a quasi-suspect class where "lawmakers have been addressing their difficulties in a manner that belies a continuing antipathy or prejudice" and that legislative response negates any claims that the group is politically powerless. From this perspective, the *UAW* court's recognition that "labor unions and strikers have been the beneficiaries of extensive legislation designed to ameliorate historic discrimination against them" should have been a compelling reason *not* to adopt a heightened degree of judicial scrutiny.

The *UAW* court's concern with the effect of the strikers amendment upon innocent family members rests upon principles in *Plyler v. Doe*, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982). In *Plyler,* the Supreme Court struck down a Texas statute which prevented schools from using state funds to educate the children of illegal aliens. The *UAW* court found that the strikers amendment, like the Texas law, directs the onus of a parent's misconduct against his family members, which the *Plyler* court found "does not comport with fundamental conceptions of justice." 457 U.S. at 220, 102 S.Ct. at 2396. Whether this factor, by itself, is sufficient to warrant heightened scrutiny is a difficult question. In *Plyler,* the primary concerns of Justice Brennan's opinion for the court (and the exclusive concerns of Justice Blackmun's concurrence) were the nature of the benefit denied—a free public education—and the danger that its denial to a discrete group of children would create a

permanent illiterate subclass. 457 U.S. at 223–4, 102 S.Ct. at 2397–98. Those extreme circumstances are not present in this case. The Court notes that courts of appeals have generally read the *Plyler* decision narrowly, confining it to facts not present here. *See, e.g., Alcarez v. Block,* 746 F.2d 593, 604–5 (9th Cir.1984) (*Plyler* inapplicable to National School Lunch Act amendment preventing children of illegal aliens from receiving subsidized meals). While in some contexts the overbreadth of laws grouping strikers and their family members together may prevent such a law from surviving the rational basis test, it does not, without more, authorize the Court to use a heightened degree of scrutiny. A rational basis test—which asks only whether the law is rationally related to a legitimate governmental objective—is therefore appropriate. *City of Cleborne,* 473 U.S. at 446, 105 S.Ct. at 3258.

■ Defendant Lyng contends that the strikers amendment serves several legitimate governmental objectives—tying the receipt of food stamps to the ability and willingness to work, maintaining the appearance of neutrality in labor disputes, and discouraging polarization rather than compromise in labor disputes. While plaintiffs would also characterize the law as an attempt to punish strikers and their families, they do not dispute that the objectives proffered by Defendant Lyng are legitimate governmental objectives. The legislative history of the amendment indicates that the provision was defended by reference to these objectives, and there is no explicit or implicit suggestion from supporters of the amendment of an intent to punish strikers.

If the Court finds that the exclusion is rationally related to at least one of the proffered objectives, it must uphold it. Economic and social legislation is presumptively rational. *United States v. Carolene Products Co.,* 304 U.S. 144, 152, 58 S.Ct. 778, 783, 82 L.Ed. 1234 (1938). This Court cannot forget that this presumption exists in large part as a reaction to an earlier era in which federal courts routinely struck down legislation favoring workers and un-

ions when it failed to conform to a judge's notions of economic sensibility. *See, e.g., Lochner v. New York*, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905). At the same time, however, the modern rational basis test is not a toothless standard, as shown by several recent cases in which economic legislation has failed the test. *City of Cleborne; Hooper v. Bernalillo County Assessor*, 472 U.S. 612, 105 S.Ct. 2862, 86 L.Ed.2d 487 (1985); *Williams v. Vermont*, 472 U.S. 14, 105 S.Ct. 2465, 86 L.Ed.2d 11 (1985); *Metropolitan Life Insurance Co. v. Ward*, 470 U.S. 869, 105 S.Ct. 1676, 84 L.Ed.2d 751 (1985). *See, generally,* Andersen, *Equal Protection During the 1984 Term: Revitalized Rational Basis Examination in the Economic Sphere*, 36 Drake L. Rev. 25 (1987).

The *Ledesma* court found that the strikers amendment was rationally related to the objective of government neutrality in labor disputes. The plaintiffs in this case contend that the neutrality objective cannot justify the exclusion because they believe the government is not in fact neutral. "Businesses continue to receive full tax benefits for losses incurred during a strike and government contracts can continue to be let to such businesses." (Memorandum in Support of Plaintiffs' Motion for a Preliminary Injunction at 10). However, "the Equal Protection Clause does not require that [governments] must choose between attacking every aspect of a problem or not attacking the problem at all." *Dandridge v. Williams*, 397 U.S. 471, 486, 90 S.Ct. 1153, 1162, 25 L.Ed.2d 491 (1970). Thus, it is not enough to show that the government has not fully achieved this goal of neutrality. The proper question is whether progress toward that goal is rationally furthered by the strikers amendment.

With the amendment, the balance of indirect governmental benefits may or may not tip in the favor of management.[7] However, without the amendment, the balance could tip decidedly in labor's favor, because only labor would receive a tangible and individualized form of compensation which is so effective in counteracting the effects of a strike. No comparable safety net for management is presently in place. If Congress' attempt at neutrality is irrational because it permits each side to receive different kinds of tax benefits but does not permit more direct forms of aid, then a similar concept of neutrality embodied in the Supreme Court's religion cases is also irrational. *Compare Walz v. Tax Commission*, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970), *and Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). The Court does not believe that either conception is irrational, and concludes that the strikers amendment rationally furthers the legitimate governmental objective of neutrality. This goal is also advanced through the treatment of strikers in households rather than as individuals, so that the alleged overbreadth of the strikers amendment does not make the law irrational. This objective also provides a rational basis for treating strikers differently from those who quit and those who attempt to defraud the system.

This conclusion does not mean that the Court believes that the strikers amendment is a good law or even a good way to save money. In fact, the Court suspects that the food stamps program would be less costly if Congress strengthened the power of workers to hold out for wages high enough to disqualify them for food stamps. However, it is for Congress and not the federal courts to choose the best way to run the food stamps program and to achieve the proper balance of power between labor and management. As long as Congress has acted rationally and has not otherwise abridged any protected constitutional right, this Court cannot interfere.

IT IS THEREFORE ORDERED that the defendants' motion for a stay of proceedings is denied.

---

7. The Court recognizes that labor already benefits somewhat through the tax-exempt status given to labor organizations and their assets. 26 U.S.C. § 501(c)(5) (1982). If statutory rights are considered a form of government benefit, the balance certainly does not tip in favor of management, because Congress has created far more labor rights than management rights. *See, e.g.,* 29 U.S.C. § 157 (1982). Thus, the Court cannot conclude that food stamps for strikers are needed to restore the balance between management and labor.

IT IS FURTHER ORDERED that the plaintiffs' motion for a preliminary injunction is denied.

IT IS FURTHER ORDERED that the defendants' motion to dismiss under Rule 12(b)(6) is granted.