INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, UAW, et al., Plaintiffs,

v.

Richard E. LYNG, Secretary, U.S. Department of Agriculture, Defendant.

Civ. A. No. 84–3303.

United States District Court, District of Columbia.

Nov. 14, 1986.

Jordan Rossen, Gen. Counsel, Richard W. McHugh, Asst. Gen. Counsel, UAW Legal Dept., Detroit, Mich., Michael Holland, Gen. Counsel, UMWA, Judith A. Scott, UMWA, Legal Dept., Wendy L. Kahn, Dwerdling, Schlossberg, Leibig & Kahn, Washington, D.C., for plaintiffs; Harold A. Katz and Ann C. Hodges, Katz, Friedman, Schur & Eagle, Chicago, Ill., of counsel.

Richard K. Willard, Acting Asst. Atty. Gen., Joseph E. diGenova, U.S. Atty., Lewis K. Wise and Thomas Miller, Attys., Civil Div., Dept. of Justice, Washington, D.C., for defendant; Roger Wiener, Office of Gen. Counsel, Dept. of Agriculture, Washington, D.C., of counsel.

## MEMORANDUM

OBERDORFER, District Judge.

### I.

As described more fully in a Memorandum filed September 30, 1985,[1] this matter involves a challenge to the constitutionality of a 1981 amendment[2] to the Food Stamp Act of 1977.[3] That amendment precludes a household from becoming eligible for food stamps if a member of that household is on strike because of a labor dispute.[4] Accord-

---

1. A copy is attached hereto and hereinafter referred to as "1985 Memorandum."

2. 7 U.S.C. § 2015(d)(3). Hereinafter sometimes referred to as the "striker amendment."

3. 7 U.S.C. §§ 2011–2029.

4. In full, the amendment provides:
   Notwithstanding any other provision of law, a household shall not participate in the food stamp program at any time that any

ing to a Senate Committee report, the amendment is designed to promote government neutrality in labor disputes and to promote the food stamp program's "underlying policy of tying receipt of food stamps to the ability and willingness to work." S.Rep. No. 139, 97th Cong., 1st Sess. 62 (1981), U.S.Code Cong. & Admin.News 1981, pp. 396, 452.

█ Food stamps are issued not to an individual but to a household, consisting of the persons who normally purchase food and eat together. The law presumes that a close family of husband, wife and children purchase food and eat together. *See Lyng v. Castillo,* — U.S. —, 106 S.Ct. 2727, 91 L.Ed.2d 527 (1986). As a result, the striker amendment has the effect of denying food stamps not only to a striker, but also to anyone with whom the striker actually or presumptively purchases and shares food.

Plaintiffs are two unions and several individual union members[5] who have been ineligible for food stamps because they are or have been on strike. They have challenged the striker amendment as unconstitutionally violative of their due process, equal protection, and First Amendment rights. Their original pleadings sought a preliminary injunction, but did not include any motion for summary judgment. Defendant moved to dismiss plaintiffs' complaint, but filed no other dispositive motion. The 1985 Memorandum denied defendant's motion to dismiss and plaintiffs' motion for a preliminary injunction, but, anticipating summary judgment motions, concluded:

> [O]nce plaintiffs establish the facts proffered about the effects of the anti-striker statute, they may well prevail on the merits of their claim that the anti-striker amendment violates rights guaranteed to plaintiffs by the First Amendment to associate with their families, their unions and fellow union members.

1985 Memorandum at 1253. Since then, the parties have conducted extensive discovery and have filed cross-motions for summary judgment, accompanied by appropriate statements of undisputed material facts and statements of genuine issues. Plaintiffs' Motion for Summary Judgment (filed December 20, 1985); Defendant's Motion for Summary Judgment (filed February 24, 1986). Consideration of the issues thereby framed was delayed pending the Supreme Court's decision in *Lyng v. Castillo, supra.* After the *Lyng* opinion was rendered, the parties exchanged supplemental briefs addressing *Lyng*'s implications for this case. The cross-motions are now ripe for decision.

## II.

The exchange of statements of undisputed facts which accompanied the cross-motions for summary judgment enables the Court to ratify and find the facts stated in the 1985 Memorandum and the following additional undisputed material facts:

1. The plaintiff labor unions are labor organizations which exist for the purpose, *inter alia,* of advancing the economic and political interests of their members. Plain-

---

member of such household, not exempt from the work registration requirements of paragraph (1) of this subsection, is on strike as defined in section 142(2) of Title 29, because of a labor dispute (other than a lockout) as defined in section 152(9) of Title 29: *Provided,* That a household shall not lose its eligibility to participate in the food stamp program as a result of one of its members going on strike if the household was eligible for food stamps immediately prior to such strike, however, such household shall not receive an increased allotment as a result of a decrease in the income of the striking member or members of the household: *Provided further,* That such ineligibility shall not apply to any household that does not contain a member on strike, if

any of its members refuses to accept employment at a plant or site because of a strike or lockout.

7 U.S.C. § 2015(d)(3), as amended by § 109 of the Omnibus Budget Reconciliation Act of 1981. *See also* 7 C.F.R. § 273.1(g) (1985).

5. The union plaintiffs are International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW, and United Mine Workers of America. The individual plaintiffs are Mary Berry, Johnie B. Blake, Barm Combs, Patricia Ann Combs, Mark Dyer and Geneva Dyer. First Amended Complaint (filed November 7, 1984) at ¶¶ 3–11.

tiffs' Statement of Material Facts [hereinafter "Plaintiffs' Statement"] at ¶ 1; Defendant's Statement of Genuine Issues [hereinafter "Defendant's Statement"] at ¶ 1.

2. The 1981 amendment to the Food Stamp Act of 1977 disqualifies households from obtaining food stamps if the household contains a member involved in a labor dispute, other than a lockout, unless the household was eligible for food stamps prior to the strike. Plaintiffs' Statement at ¶ 2; Defendant's Statement at ¶ 2.

A 1981 House Report of the House Agriculture Committee commented:

> In the 1977 Act, this Committee refused to eliminate strikers and the members of their households from consideration for participation [in the food stamp program] simply because they were on strike, since such an automatic exclusion seemed unfair and inequitable and would have involved the government in the non-neutral act of pressuring the worker to abandon the strike.

H.Rep. 97–106(I) at 142 (1981), cited in Plaintiffs' Brief in Support of Motion for Summary Judgment at 7 n. 3. Congress passed the striker amendment and the President signed it, despite the House Committee's reservations.

3. A striker's household is disqualified for an indeterminate period, i.e., during the period of the strike. The disqualification has been administered in some cases to deny eligibility to strikers and their households even after the strikers have been permanently replaced. Plaintiffs' Statement at ¶ 11; Defendant's Statement at ¶ 11.

4. In order to regain food stamp eligibility, strikers have the choice of leaving their households, abandoning a strike by returning to work, quitting their jobs, or attempting to persuade their unions to call off the strike. See 1985 Memorandum at 1246; Plaintiffs' Statement at ¶¶ 2, 3; Defendant's Statement at ¶¶ 2, 3.

5. The individual plaintiff Mary Berry was denied food stamps solely due to her status as a striker on August 27, 1984. The International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW) and UAW Local 985 of which Mary Berry is a member, have conducted a strike at Plymouth Stamping Company from September 9, 1980 until the present in opposition to the employer's demands for concessions and in opposition to the unfair labor practices of the employer.[6] Plaintiffs' Statement at ¶ 4; Defendant's Statement at ¶ 4.

6. Individual plaintiff Mark Dyer *and his household* were denied food stamps in August, 1984, because of his status as a striker. Plaintiffs' Statement at ¶ 6; Defendant's Statement at ¶ 6.

7. Individual plaintiff Barm Combs *and his household* were denied food stamps in September, 1984, because of his status as a striker. Plaintiffs' Statement at ¶ 6; Defendant's Statement at ¶ 6.

Dyer and Combs were engaged in a United Mine Workers of America (UMWA) selective strike beginning August 1, 1984, which lasted until April 2, 1985, in an attempt to gain recognition for UMWA and in opposition to the alleged unfair labor practices of the Brush Creek Coal Company, Inc., and its alter egos. *Compare* Plaintiffs' Statement at ¶ 7 *with* Defendant's Statement at ¶ 7.

8. Individual plaintiff Johnie Blake remained disqualified for food stamps even though her employer had replaced her and thereby foreclosed her opportunity to return to her job. See Affidavit of Johnie Blake at ¶ 10 (filed February 19, 1985).

---

**6.** Defendant does not know the reasons for the Plymouth strike, and does not refute plaintiff Mary Berry's statement that that strike is in opposition to unfair labor practices of the employer, but claims that the reasons are not relevant to a decision here. Defendant's Statement at ¶ 4. However, the distinction made by the striker amendment between strikers and voluntary quitters who are given a hearing and exemption if they quit a job because of unfair treatment is quite relevant. See Memorandum at 1237, *infra.* Defendant's objection is overruled.

9. Some individuals have been told by state agencies or have learned that they can avoid household disqualification by having the striker leave the household. *Compare* Plaintiffs' Statement at ¶ 9 *with* Defendant's Statement at ¶ 9.

10. Some strikers who have been denied food stamps have voted to ratify or accept collective bargaining agreements which were less favorable than they personally believed appropriate. These votes were motivated by lack of wages as a result of being on strike and out of work and, to a lesser degree, lack of food stamps. *Compare* Plaintiffs' Statement at ¶ 10 *with* Defendant's Statement at ¶ 10.

11. Barm Combs quit his strike at Brush Creek Coal Company and abandoned his union membership and thereafter received food stamps. Combs testified that:

> I believe that if I had gotten food stamps to help my family during the strike against Brush Creek Coal Company, I could have stayed on the picket line throughout the strike and would not have abandoned my union membership.

Affidavit of Barm Combs at 4. Moreover, he had to pay an initiation fee to the union when he eventually went back to work after the strike was over. Plaintiffs' Statement at ¶ 13; Defendant's Statement at ¶ 13. It is specifically found that the denial of food stamps to Combs' household was a proximate cause of his abandoning his association with his fellow strikers and his disassociation from his union.

12. Even though Donald Gibson, a member of the AFL–CIO, was permanently replaced by his employer, he was disqualified from receiving food stamps solely because he was still a member of the union and still receiving strike pay from the union. *Compare* Plaintiffs' Statement at ¶ 12 *with* Defendant's Statement at ¶ 12.

13. Anthony Tracy, a member of AFL–CIO, left a picket line to seek other work and lost his union membership and strike benefits.[7] Plaintiffs' Statement at ¶ 13.

14. Under the constitutions of UAW and UMWA, a member who abandons a strike by crossing a picket line and returning to work can be subjected to charges, trial, and penalty, including expulsion from the union. Plaintiffs' Statement at ¶ 14; Defendant's Statement at ¶ 14.

15. In addition, as more fully stated in Appendix A attached to the 1985 Memorandum, there are substantial differences between the treatment accorded to strikers by operation of the 1981 amendment to the Food Stamp Act and the treatment accorded to employees who quit their jobs voluntarily and not in concert with others. For example, a striker's household remains disqualified as long as the striker is on strike. 7 C.F.R. § 273.1(g) (1985). The household of an individual voluntary quitter is disqualified for only 90 days, after which food stamp eligibility is restored if the quitter seeks other work and the household remains otherwise eligible. 7 C.F.R. § 273.-7(n)(1)(v). Moreover, even the original 90–day disqualification does not apply if the quitter can show "good cause" for leaving work. The individual quitter is entitled to a good cause hearing. Good cause includes discrimination by an employer or unreasonable work conditions. 7 C.F.R. § 273.-7(n)(3)(i), (ii). There is no provision for such a good cause hearing or exception for strikers. In addition, a household including a voluntary quitter becomes ineligible only if the quitter is the primary breadwinner. 7 C.F.R. § 273.7(n)(1)(iv). The presence of any striker in a household disqualifies the entire household.

### III.

In support of the summary judgment motion, plaintiffs argue that the 1981 amendment (1) impairs the constitutional rights of the individual plaintiffs to associate with their families and unions in viola-

---

7. Defendant's objection to the testimony of Tracy's wife on hearsay grounds is without merit. She states that her affidavit is based on personal knowledge. Nor is Tracy's experience irrelevant just because he is neither a plaintiff nor a member of a union. He is a competent witness to the effect of the Food Stamp Program on strikers.

tion of the First Amendment, and (2) impairs these rights without rationally furthering a legitimate governmental purpose in violation of the Due Process clause of the Fifth Amendment.

The 1985 Memorandum, filed before the Supreme Court decided *Lyng*, anticipated that if plaintiffs proved what they alleged, they might well prevail on the merits. The threshold question at this stage of the proceeding, therefore, is whether *Lyng* established a standard of review which superseded that applied by the Supreme Court in *Department of Agriculture v. Moreno*, 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973), and relied upon in the 1985 Memorandum.

The *Lyng* plaintiffs challenged the constitutionality of the legislative presumption that parents, children and siblings who live together constitute a single "household" for food stamp purposes, whereas other groups of people, such as more distant relatives or groups of unrelated people, are treated as a household only if the members of the group customarily purchase food and prepare meals together. A lower court struck down this aspect of the food stamp system on the ground that it discriminated against households of close relatives.

The *Lyng* Court determined that in that case the statutory definition of household should not be subjected to "heightened scrutiny" because close relatives are not a "suspect" or "quasi suspect" class. In this respect the Supreme Court noted that close family members have not as "a historical matter ... been subjected to discrimination; they do not exhibit obvious, immutable, or distinguishing characteristics that define them as a discrete group; and they are not a minority or politically powerless." 106 S.Ct. at 2729. Nor, said the Court, did the classification " 'directly and substantially' interfere with family living arrangements and thereby burden a fundamental right." 106 S.Ct. at 2729, *quoting Zablocki v. Redhail*, 434 U.S. 374, 387, 98 S.Ct. 673, 681, 54 L.Ed.2d 613 (1978). Further, the Court assumed, without apparent benefit of individualized evidence or trial

court findings, that the " 'household' definition does not order or prevent any group of persons from dining together" and that "in the overwhelming majority of cases it probably has no effect at all." 106 S.Ct. at 2730. The Court further assumed that

It is exceedingly unlikely that close relatives would choose to live apart simply to increase their allotment of food stamps, for the cost of separate housing would almost certainly exceed the incremental value of the additional stamps.

106 S.Ct. at 2730.

The *Lyng* Court distinguished its earlier decision in *Moreno*. *Moreno* had held unconstitutional a 1971 definition of "household" which distinguished between households composed entirely of persons who are related to one another and households containing one or more members who are unrelated to the rest. The *Lyng* Court identified the vice of the 1971 definition at issue in *Moreno* to be the fact that it not only disqualified groups of unrelated persons, but it also disqualified an otherwise eligible group of closely related persons solely because they shared their home with one or more unrelated persons. The *Lyng* Court also pointedly noted a House Committee observation that the proviso at issue in *Moreno* "was essentially an attempt to ban food stamp participation by communal households (so-called 'hippie communes')." *Lyng*, 106 S.Ct. at 2730 n. 3.

Suggesting that "heightened scrutiny" was in order in neither the *Moreno* nor the *Lyng* situation, the *Lyng* Court concluded that the classification there at issue, unlike that considered in *Moreno*, was valid because it "is rationally related to a legitimate government interest" in administrative convenience. *Lyng*, 106 S.Ct. at 2730.

Insofar as the striker amendment denies food stamps to an individual striker, it is, in one sense, rationally related to legitimate legislative objectives—requiring a person able to work to do so in order to receive food stamps and promoting government neutrality in strikes. *See Califano v. Aznavorian*, 439 U.S. 170, 99 S.Ct. 471, 58 L.Ed.2d 435 (1978). However, as plaintiffs

correctly suggest, even though "heightened scrutiny" may not be in order:

> A classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.'

Plaintiffs' Opposition at 4, quoting *Reed v. Reed*, 404 U.S. 71, 76, 92 S.Ct. 251, 254, 30 L.Ed.2d 225 (1971), quoting *Royster Guano Co. v. Virginia*, 253 U.S. 412, 415, 40 S.Ct. 560, 561–62, 64 L.Ed. 989 (1920); *see also Mathews v. Lucas*, 427 U.S. 495, 510, 96 S.Ct. 2755, 2764–65, 49 L.Ed.2d 651 (1976). *Cf. Western & Southern Life Insurance Co. v. State Board of Equalization of California*, 451 U.S. 648, 672, 101 S.Ct. 2070, 2085, 68 L.Ed.2d 514 (1981); *Weinberger v. Salfi*, 422 U.S. 749, 772, 95 S.Ct. 2457, 2470, 45 L.Ed.2d 522 (1975). Accordingly, as stated preliminarily in the 1985 Memorandum, application of this standard to the undisputed facts developed in the exchange of summary judgment motions yields the following conclusions:

■ (1) The disputed limitation on food stamps for strikers interferes or threatens to interfere with the First Amendment right of the individual plaintiffs to associate with their families, *see Zablocki v. Redhail, supra*, with their union, *see Allee v. Medrano*, 416 U.S. 802, 819 n. 13, 94 S.Ct. 2191, 2202 n. 13, 40 L.Ed.2d 566 (1974), and with fellow union members, *see NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 933, 102 S.Ct. 3409, 3436, 73 L.Ed.2d 1215 (1982); *Professional Association of College Educators v. El Paso County Community College District*, 730 F.2d 258 (5th Cir.), *cert. denied*, 469 U.S. 881, 105 S.Ct. 248, 83 L.Ed.2d 186 (1984), as well as the reciprocal First Amendment right of each union plaintiff to its members' association with the union. It may be that a striker would not live apart from close family members in order to provide them with food stamps. *See Lyng*, 106 S.Ct. at 2730. But as defendant has bluntly stated, the striker has, as an alternative to leaving his family, the further options of quitting his job or returning to work. Pursuit of either of these alternatives would obviously sever or at least threaten his association with his union and fellow union members. Indeed, that is exactly what has happened to plaintiff Combs. Denial of food stamps to his family was a proximate cause of his disassociation from a strike, his fellow strikers, and his union.

(2) The statute as administered interferes with strikers' right to express themselves about union matters free of coercion by the government. *See Abood v. Detroit Board of Education*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977). The defendant states that it anticipates that plaintiffs whose personal resources are depleted by loss of wages *and* denial of food stamps as a result of being on strike "can pressure their union to reach a settlement." Defendant's Response to Question Nos. 3 and 4 of the Court's April 14, 1985 Notice to Counsel, and Reply to Plaintiffs' Response Thereto at 3 (filed June 28, 1985). As the Supreme Court stated in respect of infringement of the First Amendment's guarantee of religious freedom by denial of unemployment benefits to persons whose religious beliefs precluded Saturday work:

> Here not only is it apparent that appellant's declared ineligibility for benefits derives solely from the practice of her religion, but the pressure upon her to forego that practice is unmistakable. The ruling forces her to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand.

*Sherbert v. Verner*, 374 U.S. 398, 404, 83 S.Ct. 1790, 1794, 10 L.Ed.2d 695 (1963). The same dynamic is present here and requires a conclusion that denial of food stamps to the individual plaintiffs violates their First Amendment right to associate and to express themselves freely in the course of that association.

(3) As previously stated, the *Lyng* Court conspicuously distinguished the family that was the plaintiff there from groups which

have as "a historical matter ... been subject to discrimination" or are frequently in the stance of an unpopular political minority. Indeed, *Lyng* can be read as distinguishing *Moreno*, in part at least, because of a hint of animus against "hippies" reflected in the legislative history of the food stamp provision, 7 U.S.C. § 2012(e), struck down by the *Moreno* Court. *Lyng*, 106 S.Ct. at 2730 n. 3. Strikers are a group which, at least as "a historical matter," has "been subject to discrimination," may be defined as a discrete group by "obvious and distinguishing characteristics," and has frequently been in the stance of an unpopular political minority. *See generally*, 18 Encyclopaedia Britannica, *Trade Unionism* 563, 565–66 (1974). *Compare Lyng*, 106 S.Ct. at 2729. There is judicially noticeable scholarly work evidencing discrimination in the form of public and official hostility against labor unions in general and strikers in particular. *See, e.g.*, 18 Encyclopaedia Britannica, *supra*, at 565–66; I. Bernstein, *The Lean Years: A History of the American Worker, 1920–1933* (1960). Indeed, labor unions and strikers have been the beneficiaries of extensive legislation designed to ameliorate historic discrimination against them. *See, e.g.*, 29 U.S.C. § 104 (no injunction against ceasing or refusing to work) and 29 U.S.C. § 163 (preserving the right to strike). This history makes this case more nearly resemble *Moreno* than *Lyng*.

(4) As spelled out in Appendix A to the 1985 Memorandum and summarized in the findings, there are significant and discriminatory differences between the treatment accorded a striker who stops work in concert with others and an individual who quits a job. Defendant's justification of the striker amendment as a device to deny food stamps to persons able to work is seriously weakened by these disparities. *See* Memorandum at 1236, *supra.*

(5) Finally, and critical to appraisal of rationality, the striker amendment impermissibly strikes at the striker through his family. *See Plyler v. Doe*, 457 U.S. 202, 220, 102 S.Ct. 2382, 2396, 72 L.Ed.2d 786 (1982). For reasons of administrative convenience, food stamps are now issued to households, not to individuals. The striker amendment automatically cuts off food stamps not only from a striker but also from the entire household, including the striker's spouse and children. Legislation superimposing the striker provision onto the *household* stamp allocation system necessarily means that a striker who is a member of a household and who exercises his constitutionally protected rights to associate with his union and other members and to form and express his opinion about the merits of the strike sacrifices not only his own foodstamps but also those of other members of his household, including infant children and the dependent elderly. In these circumstances, the "onus" of the striker's exercise of his associational rights falls as heavily on the innocent members of the family as it does on the striker himself. Whether intended or not, "legislation directing the onus of a parent's misconduct against ... [a spouse and] children does not comport with fundamental conceptions of justice." *Plyler v. Doe, supra*, at 220, 102 S.Ct. at 2396; *see also Weber v. Aetna Casualty & Surety Co.*, 406 U.S. 164, 175, 92 S.Ct. 1400, 1406, 31 L.Ed.2d 768 (1972).

Neither administrative convenience nor the desirability of maintaining government neutrality in labor disputes justifies the denial of food stamps to innocent members of a striker's household if this legislative purpose could be achieved by more narrowly tailored measures. *See Hobson v. Wilson*, 737 F.2d 1, 28 (D.C.Cir.1984), *cert. denied*, 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985).[8] *See also Moreno, su-*

---

**8.** In *Hobson,* the Court of Appeals stated:
A line of Supreme Court cases ... expressly established ... that lawful associations and their members have the right to be protected from facially legitimate Government actions that would deter membership or otherwise thwart their efforts to associate and petition

the Government for redress of their grievances.... unless the Government could demonstrate a substantial ... or compelling ... interest to justify the infringement, *and that the interest could not more narrowly be accommodated.*
737 F.2d at 28 (emphasis added).

*pra; United Steelworkers of America v. Johnson,* 799 F.2d 402 (8th Cir.1986).

Adjusting the food stamp allotment to exclude the striker would be neither difficult nor intrusive. The current food stamp system requires the government to know the number of persons in a household in order to determine the value of the food stamps for which the household is eligible. *See Lyng,* 106 S.Ct. at 2730 n. 4, citing S.Rep. No. 97–504, at 24, U.S.Code Cong. & Admin.News 1982, at pp. 1641, 1662. Because of economies of scale, small households (one, two or three persons) are provided more food stamps per person than larger households. For example, current benefit levels are $70 for 1, $128 for 2, $183 for 3 person households. *See Lyng,* 106 S.Ct. at 2370 n. 4. Furthermore, existing procedures for administering the food stamp program necessarily require official knowledge of the striker's presence within the household. Administratively, it is as feasible to reflect in a household's food stamp allotment the presence of a striker as it is to reflect a decrease in the size of a household. In fact, the system now permits a striker's immediate family to receive an adjusted allotment of food stamps if the striker leaves the household; the system could, with equal ease, permit the immediate family of a striker who stayed at home but continued on strike, to receive a similar adjusted allotment. The obvious feasibility of a tailored plan requires the conclusion that administrative convenience does not justify denial of food stamps to an entire household solely because one member of it engages in a strike. Nor does the government interest in neutrality in labor disputes justify putting the onus of the striker's conduct on his family when entitlement to food stamps would be restored if the striker left his family, or his family left him.

The foregoing requires the conclusion that the striker amendment as administered, when considered in light of its impact on the constitutional rights of the plaintiffs and on innocent members of the families of the individual plaintiffs, is not sufficiently tailored to the objectives stated by its defenders to pass constitutional muster.

Accordingly, an accompanying order will declare that defendant may not lawfully withhold food stamps from any individual plaintiff's household solely because the household includes a striker for the reason that the striker amendment as administered violates rights guaranteed to plaintiffs by the First and Fifth Amendments to the Constitution. No injunction will issue at this time in the expectation that when this judgment becomes final the defendant will honor it without compulsion.

## APPENDIX

INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, UAW, *et al.,* Plaintiffs,

v.

JOHN R. BLOCK, Secretary U.S. Department of Agriculture, Defendant.

Sept. 30, 1985.

### MEMORANDUM

#### I.

At issue here is the constitutionality of a 1981 amendment (7 U.S.C. § 2015(d)(3)) to the Food Stamp Act of 1977 (7 U.S.C. §§ 2011–2029)), which generally precludes a family from becoming eligible for food stamps when a member of the family is also a member of a union which is on strike, i.e., the member has participated in a "concerted interruption [of an employer's] operations by employees." 7 C.F.R. § 273.1(g)(2) (1985). Plaintiffs are the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW), United Mine Workers of America (UMWA), individual members of those unions who are on strike in the midwest and in Kentucky, respectively, and members of those strikers' fami-

lies.[1] They sue the Secretary of Agriculture in his official capacity as the official responsible for administration of the food stamp program.

Section 6(d)(3) of the Food Stamp Act of 1977, 7 U.S.C. § 2015(d)(3), as amended by § 109 of the Omnibus Budget Reconciliation Act of 1981, provides:

> Notwithstanding any other provision of law, a household shall not participate in the food stamp program at any time that any member of such household, not exempt from the work registration requirements of paragraph (1) of this subsection, is on strike as defined in section 142(2) of Title 29, because of a labor dispute (other than a lockout) as defined in section 152(9) of Title 29: *Provided,* That a household shall not lose its eligibility to participate in the food stamp program as a result of one of its members going on strike if the household was eligible for food stamps immediately prior to such strike, however, such household shall not receive an increased allotment as a result of a decrease in the income of the striking member or members of the household: *Provided further,* That such ineligibility shall not apply to any household that does not contain a member on strike, if any of its members refuses to accept employment at a plant or site because of a strike or lockout.

The federal regulations which implement this amendment provide for striker disqualification from food stamps in substantially the same words.[2] Congress's purpose was stated by the Senate Committee:

> (g) *Strikers.* (1) Households with striking members shall be ineligible to participate in the Food Stamp Program unless the household was eligible for benefits the day prior to the strike and is otherwise eligible at the time of application. However, such a household shall not receive an increased allotment as a result of a decrease in the income of the striking member(s) of the household.
>
> (2) For food stamp purposes, a striker shall be anyone involved in a strike or concerted stoppage of work by employees (including a stoppage by reason of the expiration of a collective-bargaining agreement) and any concerted slowdown or other concerted interruption of operations by employees. Any employee affected by a lockout, however, shall not be deemed to be a striker. Further, an individual who goes on strike who is exempt from work registration, in accordance with § 273.7(b), the day prior to the strike, other than those exempt solely on the grounds that they are employed, shall not be deemed to be a striker. Examples of non-strikers who are eligible for participation in the program include but are not limited to:
>
> (i) Employees whose workplace is closed by an employer in order to resist demands of employees (e.g., a lockout);
>
> (ii) Employees unable to work as a result of striking employees (e.g., truckdrivers who are not working because striking newspaper pressmen prevent newspapers from being printed); and,
>
> (iii) Employees who are not part of the bargaining unit on strike who do not want to cross a picket line due to fear of personal injury or death.
>
> (3) Pre-strike eligibility shall be determined by considering the day prior to the strike as

---

1. Plaintiffs allege specific injuries suffered by them due to the application of the striker disqualification provision. For example, plaintiff Mary Berry's only income during this strike is allegedly $85 per week in UAW strike insurance benefits, and medical insurance also paid for by the union. Her monthly expenses exceed this amount. During the strike she has used up her savings and sold off her personal property to pay her expenses and those of her teenage son. In April, 1981, she moved out of her apartment because she was no longer able to pay the rent. At that time, she moved to a rental room and voluntarily gave up custody of her son to her ex-husband because she could no longer pay to support him. Her son now continues to live with his father. Berry applied for food stamps on August 27, 1984, and her application was denied that same day because of her status as a striker. Declaration of Mary Berry (filed Jan. 10, 1985).

Plaintiff Johnie B. Blake's household non-exempt assets are allegedly less than $1500. The household's total monthly income for seven people is $1010. This amount does not cover the household's expenses. Blake has numerous unpaid hospital bills. Her gas was turned off because of unpaid bills. She also owes payments on her water bill, her sewage bill, and on her mortgage payment. In about July, 1984, Blake and her household were denied food stamps because she was on strike. Since the filing of this law suit, Blake has begun receiving food stamps because the UAW ended the strike at her plant. Declaration of Johnie B. Blake (filed Jan. 10, 1985); Supplemental Declaration of Johnie B. Blake (filed Feb. 11, 1985).

2. The regulation reads:

Granting benefits to strikers can be seen as encouragement to workers to "wait out" management rather than compromise.

. . . .

[D]enying benefits (or denying increased benefits) to households containing members on strike is consistent with the underlying policy of tying receipt of food stamps to the ability and willingness to work, as exemplified by provisions requiring work registration, denying benefits to those voluntarily quitting a job without good cause, and allowing the establishment of workfare programs.

A person who leaves his job to go on strike has given up the income from the job of his own volition. A person making such a choice and participating in a strike must bear the consequences of his decision without assistance from the food stamp program.

S.Rep. No. 139, 97th Cong., 1st Sess. 62 (1981), U.S.Code Cong & Admin.News 1981, p. 452.

The complaint (as amplified by plaintiffs' briefs) alleges that the food stamp program was intended by Congress to alleviate hunger and malnutrition by increasing the food purchasing power of low income households, with need determined pursuant to national eligibility standards of household size, income and resources. The plaintiffs assert that treatment of strikers pursuant to the 1981 anti-striker amendment is punitive and irrational when compared to treatment of other "voluntarily poor" such as students and persons who quit their jobs individually, as distinguished from quitting in concert or association with fellow employees. For example, they allege that

> [i]n no case, other than a striker's, is an entire household which is otherwise eligible prevented from indefinitely participating in the Food Stamp program as a result of the act of a single household member.

First Amended Complaint for Declaratory and Injunctive Relief [First Amended Complaint] (filed Nov. 7, 1984) at ¶ 22. They claim that exclusion of strikers and their households from the food stamp program is not rationally related to its purpose and impedes the right of the union and the individual union member plaintiffs to organize and freely associate for the purpose of collective bargaining, including economic strikes and strikes against the unfair labor practices of employers.

Specifically, the complaint contains three counts. Plaintiffs first allege a violation of due process in that denial of food stamps to strikers because of their status as strikers is not rationally related to the purposes of the Act. The complaint next invokes the equal protection clause of the Constitution because strikers and their households are treated differently from all other "voluntarily poor" households. Finally, the complaint charges that the amendment violates plaintiffs' First Amendment rights of association to form and join unions for the purpose of engaging in collective bargaining, including the conducting of strikes to implement their bargaining position. For relief, plaintiffs ask for class certification,[3] for a declaratory judgment that the anti-

---

the day of application and assuming the strike did not occur.

(4) Eligibility at time of application shall be determined by comparing the striking member's income before the strike (as calculated for paragraph (g)(3) of this section) to the striker's current income and adding the higher of the two to the current income of nonstriking members during the month of application. To determine benefits (and eligibility for households subject to the net income eligibility standard), deduction shall be calculated for the month of application as for any other household. Whether the striker's pre-strike earnings are used or his current income is used, the earnings deduction shall be allowed if appropriate.

(5) Strikers whose households are eligible to participate under criteria in § 273.1(g) shall be subject to the work registration requirements under § 273.7 unless exempt under § 273.7(b) the day of application.

7 C.F.R. § 273.1(g) (1985).

**3.** They seek class certification on the ground that some 6000 other UAW members are on strike, some portion of whom remain without access to food stamps due to the operation of the striker disqualification provision. Memorandum of Law in Support of Plaintiffs' Motion for Class Certification at 2 (filed Jan. 10, 1985).

strikers provision is unlawful, for injunctions barring further implementation of the 1981 amendment and requiring retroactive payments to plaintiffs who would have been eligible for food stamps but for the application of the 1981 amendment, and for attorney's fees and costs for prosecuting the action.

Defendant moves to dismiss on the ground essentially that Congress's policy choice of barring food stamps for strikers was well within its constitutional prerogatives and the distinction drawn between strikers and other food stamp beneficiaries is not irrational. The matter is before the Court on defendant's motion to dismiss and plaintiffs' application for a preliminary injunction.[4]

## II.

### A.

In support of his motion to dismiss, defendant invokes precedents which limit judicial scrutiny of compliance of social welfare legislation with due process requirements,[5] urging that the same "rational basis" standard applies where the challenge is on equal protection grounds.[6] Defendant relies heavily upon a three-judge district court decision upholding a state statute which denied Aid to Families with Dependent Children to families where the father was on strike, which was summarily affirmed by the Supreme Court.[7] Defendant also relies upon a lower court decision which rejected an equal protection challenge to local laws denying welfare benefits to strikers and their families,[8] and the case of *Ohio Bureau of Employment Services v. Hodory*, 431 U.S. 471, 97 S.Ct. 1898, 52 L.Ed.2d 513 (1977), where the Supreme Court upheld a statute which denied unemployment benefits to workers on strike.

Defendant characterizes the rational basis test as a "minimal scrutiny standard," and argues that the amendment at issue here must be upheld if it is "rationally related to a legitimate legislative objective." *Weinberger v. Salfi*, 422 U.S. 749, 772, 95 S.Ct. 2457, 2470, 45 L.Ed.2d 522 (1975). Defendant then alleges that the striker provision of the Food Stamp Act has two specific, legitimate goals. The first goal is to ensure that receipt of food stamps is tied to "the ability and willingness to work, as exemplified by provisions requiring work registration, denying benefits to those voluntarily quitting a job without good cause, and allowing the establishment of workfare programs." Defendant's Points and Authorities in Support of Defendant's Motion to Dismiss and in Opposi-

---

**4.** Although both parties have supplemented their pleadings with substantial proffers of fact, no party has moved for summary judgment.

**5.** *E.g., Califano v. Aznavorian*, 439 U.S. 170, 174, 99 S.Ct. 471, 473–74, 58 L.Ed.2d 435 (1978):
Social welfare legislation, by its very nature, involves drawing lines among categories of people, lines that necessarily are sometimes arbitrary. The Court has consistently upheld the constitutionality of such classifications in federal welfare legislation where a rational basis existed for Congress' choice.

**6.** Both plaintiffs and defendant fail, in their pleadings, to distinguish inquiry under the due process and equal protection clauses. Their focus is rather on whether the amendment passes scrutiny under the rational basis test, which they agree applies to both the due process and equal protection claims. Consequently, in reciting the parties' allegations, the Court will recite them as presented—with little distinction between the two different claims.

**7.** Defendant quotes *Francis v. Davidson*, 340 F.Supp. 351, 367 (D.Md.), *aff'd. mem.*, 409 U.S. 904, 93 S.Ct. 223, 34 L.Ed.2d 168 (1972). The district court was
... of the opinion that rational bases exist for Maryland's position denying AFDC–E benefits to children of fathers who are out of work because of labor disputes ... Thus, the equal protection challenge to Maryland's denial of benefits to such fathers must be rejected.
In fact, the district court in *Francis disapproved* the statute at issue which denied social welfare benefits to striking fathers. The district court grounded its decision primarily on the fact that the Maryland statute at issue violated federal statutes and regulations regarding AFDC benefits. The Supreme Court affirmed without opinion. The constitutional issue was not clearly before it.

**8.** *Russo v. Kirby*, 453 F.2d 548, 551 (2d Cir.1971) ("[T]he basis of classification is clearly not unreasonable").

tion to Plaintiff's [sic] For a Preliminary Injunction [Defendant's Points and Authorities] at 14 (filed Jan. 31, 1985), *quoting* S.Rep. No. 139, 97th Cong., 1st Sess. 62 (1981), U.S.Code Cong. & Admin.News 1981, p. 452. According to the government:

> A person who leaves his job to go on strike has given up the income from the job of his own volition. A person making such a choice and participating in a strike must bear the consequences of his decision without assistance from the food stamp program.

*Id.* Defendant further argues that, as to the "willingness to work" goal, it is rational to distinguish between strikers and other voluntary quitters:

> Strikers ... retain the unilateral ability to return to work at any time. They not only have become voluntarily unemployed but also, in a real sense, they have a standing offer from their employers to return to work. Just as a person who voluntarily quits his former job loses food stamp eligibility by turning down a genuine offer of employment, a striker is not eligible under § 2015 because he is voluntarily idled by his refusal to report to work.

Defendant's Points and Authorities at 16.

Defendant argues that the second legitimate goal of the striker disqualification provision is to promote government neutrality in labor disputes. Defendant quotes a Senate report to say:

> Granting benefits to strikers can be seen as encouragement to workers to "wait out" management rather than compromise.

S.Rep. No. 139, 97th Cong., 1st Sess. 62 (1981), U.S.Code Cong. & Admin.News 1981, p. 452. Defendant then concludes his challenge to plaintiffs' equal protection claim by emphasizing his view that the rational basis inquiry to be applied here is a very limited one. According to defendant, it is only necessary that Congress "rationally could have believed" that the amendment at issue would promote its objectives.

*See Western & Southern Life Insurance Company v. State Board of Equalization of California*, 451 U.S. 648, 672, 101 S.Ct. 2070, 2085 (1981). Defendant thus argues:

> Under this test, the challenged statute easily passes constitutional muster. Even the plaintiffs must concede that Congress rationally could have believed that § 2015(d)(4) [sic] would promote government neutrality in labor disputes. It is certainly not illogical to assume, as did Congress, that the availability of food stamps may serve as an encouragement to a striker to " 'wait out' management rather than compromise." S.Rep. 97–139 at 62. Whether this objective has actually been achieved is, contrary to plaintiffs' contentions, simply irrelevant.

Defendant's Points and Authorities at 18–19.

In response to the first amendment claim, defendant seeks to distinguish between plaintiffs' "right to engage in certain labor activities" and a "right [to] compel the federal government to provide funds to support its exercise." Defendant's Points and Authorities at 2. Defendant argues that plaintiffs' contention that the striker amendment violates the First Amendment "is wrong for the simple reason that § 2015(d)(3) does not regulate speech or association, and therefore does not *abridge* the rights to speak or associate within the meaning of the First Amendment." Defendant's Response to Question Nos. 3 and 4 of the Court's April 14, 1985 Notice to Counsel, and Reply to Plaintiffs' Response Thereto [Defendant's Response to Question Nos. 3 and 4] at 5 (filed June 28, 1985) (emphasis in original). Defendant emphasizes that the striker amendment "does not violate the First Amendment because it restricts only the *government benefits available* to fund First Amendment activities, and not the activities themselves." *Id.* at 6 (emphasis in original). According to defendant, the striker disqualification provision "simply reflects Congress' judgment not to provide financial support to strikers through the food stamp program." Defendant's Points and Authorities at 4.

Defendant emphasizes the line drawn by the Supreme Court between an individual constitutional right to have an abortion and a claim that the government has a constitutional duty to finance abortions:

There is a basic difference between direct state interference with a protected activity and state encouragement of an alternative activity consonent with legislative policy. Constitutional concerns are greatest when the State attempts to impose its will by force of law; the State's power to encourage actions deemed to be in the public interest is necessarily far broader.

*Maher v. Roe,* 432 U.S. 464, 475–76, 97 S.Ct. 2376, 2383–84, 53 L.Ed.2d 484 (1977) (footnote omitted); *see also Harris v. McRae,* 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980). Defendant also cites a Fifth Circuit decision holding that a Medicare patient's constitutional right to communicate by telephone from a hospital does not require the government to reimburse for the cost of the call:

Since the government is not required to finance the exercise of First Amendment rights, the government may exclude from medicare coverage costs which may in fact be used for such purposes.

*Presbyterian Hospital of Dallas v. Harris,* 638 F.2d 1381, 1385 (5th Cir.), *cert. denied,* 454 U.S. 940, 102 S.Ct. 476, 70 L.Ed.2d 248 (1981).

A Notice to Counsel filed April 24, 1985, requested the parties to identify the alternatives available to a plaintiff on strike to make the striker and the striker's family eligible for food stamps. Defendant responded:

As the Court is aware, § 2015(d) of the Food Stamp Act disqualifies from the food stamp program any household containing a member of the household who is on strike. The only "alternatives available," therefore, are to stop being "on strike." Thus, someone on strike can either return to work or quit his job. Both of these actions demonstrate that the individual is no longer on strike. In the former circumstance, the household

will be eligible immediately for food stamp benefits. In the latter, the household will be eligible subject to the conditions imposed upon "voluntary quitters". *See* 7 C.F.R. § 273.7(n).

Defendant's Response to Question # 1 of the April 24, 1985 Notice to Counsel [Defendant's Response to Question # 1] (filed May 5, 1985).

In response to plaintiffs' contention that both of these alternatives impinge upon a striker's right to associate with his union, defendant argues that the two alternatives listed earlier do not necessarily require a striker to sever his union ties: "Plaintiffs have entirely ignored the rather obvious fact that workers feeling the economic pinch of a prolonged strike can pressure their union to reach a settlement. When settlement is reached, all union members return to work together." Defendant's Response to Question Nos. 3 and 4 at 3. Quoting the constitutions of the union plaintiffs in this case, defendant argues that the individual plaintiffs have at least two ways in which they can quit their jobs without leaving the union: "First, the striker can transfer to a job at a different plant within the jurisdiction of the same local if that plant is not being struck; second, the striker can transfer to a different local whose members are not on strike." *Id.* at 3. Defendant concedes, however, that:

[i]t may also be true that situations arise where suffering workers fail to convince their co-workers that the union should return to work, and the unions refuse to grant relief to these workers in the form of authorizing a transfer. In these situations, workers might choose to leave or be ousted from the union by quitting their union jobs or by crossing picket lines.

*Id.* at 3–4 (footnote omitted).

#### B.

Plaintiffs agree that the rational basis test is the one to apply to their equal protection and due process claims. Plaintiffs contend, however, that "merely identifying the test does not end the inquiry." Plaintiffs' Response Brief in Opposition to

Motion to Dismiss and Reply Brief in Support of Motion for a Preliminary Injunction [Plaintiffs' Opposition] at 3 (filed Feb. 11, 1985). According to plaintiffs, the rational basis test is "not toothless," *Mathews v. Lucas,* 427 U.S. 495, 510, 96 S.Ct. 2755, 2764, 49 L.Ed.2d 651 (1976). The test, argue plaintiffs, is:

> A classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.'

Plaintiffs' Opposition at 4, *quoting Reed v. Reed,* 404 U.S. 71, 76, 92 S.Ct. 251, 254, 30 L.Ed.2d 225 (1971), *quoting Royster Guano Co. v. Virginia,* 253 U.S. 412, 415, 40 S.Ct. 560, 561–62, 64 L.Ed. 989 (1920).

In support of their argument that the striker disqualification provision is irrational, plaintiffs chiefly rely on a pair of 1973 Supreme Court cases: *United States Department of Agriculture v. Moreno,* 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973) and *United States Department of Agriculture v. Murry,* 413 U.S. 508, 93 S.Ct. 2832, 37 L.Ed.2d 767 (1973). In *Moreno,* the Supreme Court held the exclusion of households of "unrelated" persons to be unconstitutional under the rational basis test. The Court explained that "unrelatedness" has nothing to do with the purpose of the Food Stamp Act, which is to meet food needs; that the goal of discriminating against "hippies" was not a legitimate government objective; and that the measure was not a rational means of preventing fraud since it added nothing to the many other anti-fraud protections already in the statute.

In *Murry,* the Supreme Court struck down a food stamp amendment which dis-qualified households from food stamps if a household member had been claimed as a tax dependent by someone other than a household member the year before. The Court found the amendment not to be a rational measure of household need for food and found it impermissible as an "irrebuttable presumption" that the household was ineligible for food stamps.[9]

Plaintiffs then apply these cases to the situation at issue. They argue that the striker provision is not a rational means of achieving either the "willingness to work" or the "neutrality" goals cited by the government. Plaintiffs point out that, prior to the striker provision, strikers seeking food stamps still had to meet all the other requirements of the Act, including registering for work, actively looking for other work, and taking any other job that was offered. 7 C.F.R. § 273.7. Thus, just as the Court in *Moreno* ruled that the "fraud-prevention" goal was not rationally furthered because the amendment challenged there added nothing to the other anti-fraud provisions already in the statute, plaintiffs here argue that the "willingness to work" goal is not rationally furthered because the striker provision adds nothing to the statute's many other "willingness to work" provisions already in effect. The provision, they contend, only pressures strikers to return to their place of employment. Yet, non-strikers can refuse to work at a plant where a strike is taking place without any food stamp penalty at all. 7 U.S.C. § 2015(d)(3). If "willingness to work" is the goal, argue plaintiffs, it is not rational to distinguish between the willingness of these two groups to work at a struck plant. Plaintiffs also argue that the provision creates an irrational "irrebuttable presump-

---

9. According to the *Murry* court:

> [The section of the Food Stamp Act at issue] makes the entire household of which a "tax dependent" was a member ineligible for food stamps for two years: (1) during the tax year for which the dependency was claimed and (2) during the next 12 months. During these two periods of time [the section at issue] creates a conclusive presumption that the "tax dependent's" household is not needy and has access to nutritional adequacy.
>
> \* \* \* \* \* \*
>
> [As such] the Act creates "an irrebuttable presumption contrary to fact."

413 U.S. at 511–12, 93 S.Ct. at 2834–35.

tion" that strikers are voluntarily unemployed regardless of the actual situations.[10]

As to the second claimed goal of the amendment, plaintiffs contend that the provision is not a rational means of ensuring government neutrality between strikers and employers because its sole conceivable effect is to disadvantage strikers. Plaintiffs first quote a 1981 floor statement by Senator Levin, 127 Cong.Rec. S6136–37 (daily ed. June 11, 1981), and a 1977 Committee Report from a previous Congress that had rejected a striker disqualification provision. H.Rep. No. 464, 95th Cong., 1st Sess. 122–27 (June 24, 1977), U.S.Code Cong. & Admin.News 1977, pp. 1704, 2091–2097. Both of these contain statements alleging that the striker provision is one-sided with respect to neutrality (e.g., businesses continue to receive full tax benefits for losses incurred during a strike, government contracts can continue to be let to such businesses). Next, plaintiffs argue that it is irrational to think that the striker provision is neutral where the strike is in response to employer conduct that has been found by an administrative law judge pursuant to a complaint issued by the National Labor Relations Board to be an unfair labor practice, such as is the case with at least one of the named plaintiffs in this case. *See* Declaration of Mary Berry at ¶ 7. In such instances, according to plaintiffs, the provision plainly has a non-neutral effect favoring the employer—it pressures strikers to surrender a legal right in order to enable their families to eat or at least obtain food stamps, without putting reciprocal pressure on the employer.

Plaintiffs also distinguish *Ohio Bureau of Employment Services v. Hodory, supra,* in which the Supreme Court held that denial of unemployment benefits to strikers is not unconstitutional. According to plaintiffs, unemployment benefits differ from food stamps in that the former are funded by employer contributions. Consequently, strikers could put additional pressure on an employer by filing for unemployment benefits during a strike. Moreover, unemployment benefits are paid to the claimant alone, rather than allotted by household. Neither of these facts are true of food stamps. Thus, the justification for finding neutrality in *Hodory* is not present here. Rather than ensuring neutrality, plaintiffs argue, the food stamps provision punitively burdens the striker.

Also in support of their argument that the striker disqualification provision is irrational, plaintiffs proffer proof of the difference in treatment between strikers and other voluntary quitters. For example, voluntary quitters can avoid disqualification by showing "good cause" for their quit, e.g., employer discrimination or participation in unfair labor practices. 7 C.F.R. § 273.-7(n)(3)(i), (ii). The striker disqualification is absolute: no matter what may be the misconduct of the employer, the employees who strike are disqualified. 7 C.F.R. § 273.1(g).[11]

Finally, plaintiffs argue that indefinite disqualification of a striker's entire household is irrational. They quote *Plyler v. Doe,* a case involving Texas' refusal to educate the children of illegal aliens, to say:

Even if the State found it expedient to control the conduct of adults by acting against their children, legislation directing the onus of a parent's misconduct against his children does not comport with fundamental conceptions of justice.

. . . . .

[The challenged statute] is directed against children, and imposes its discriminatory burden on the basis of a legal characteristic over which children can have little control. It is thus difficult to

---

**10.** For example, Johnie Blake, a plaintiff in this case, remained disqualified for food stamps even though the union had made an unconditional offer to return to work, because despite the unconditional offer the employer refused to reinstate the employees. *See* Affidavit of Samuel F. Casazza at ¶ 5 (filed Feb. 11, 1985).

**11.** Other specific differences in treatment between strikers and voluntary quitters are set out in Appendix A.

conceive of a rational justification for penalizing these children for their presence within the United States.

457 U.S. 202, 220, 102 S.Ct. 2382, 2396, 72 L.Ed.2d 786 (1982). By the same reasoning, plaintiffs argue that application of the striker provision to children and others who happen to be present in the striker's household is irrational and a violation of equal protection.

As its third cause of action, plaintiffs' complaint alleges:

> The anti-striker provision of the Act denies the plaintiffs UAW and UMW[A] and the members of the plaintiffs UAW and Mine Workers their rights of association as ensured by the First Amendment to the United States Constitution to form and join unions for the purpose of engaging in collective bargaining, including the conducting of strikes.

First Amended Complaint at 10. In a later filing, plaintiffs argue further:

> This Court, in applying the rational basis test of the equal protection clause, should take the direct First Amendment implications of the anti-striker amendment into account in weighing the rationality and legitimacy of the provision.

Plaintiffs' Supplemental Post-Hearing Brief at 13–14 (filed March 7, 1985). Finally, in response to the Notice to Counsel issued by this Court on April 24, 1985, plaintiffs argue:

> By conditioning eligibility for Food Stamps on the willingness of an individual to break ranks with fellow union members, the anti-striker provision punishes individuals and their families for the exercise of the statutorily protected right to strike.
>
> More importantly for the purposes of this lawsuit, the anti-striker provision inevitably effects [sic] the associational rights of unions and their members by depriving strikers of food assistance to which they are otherwise entitled solely by virtue of their concerted activity.

Plaintiffs' Memorandum of Law Responding to the Court's Notice of April 24, 1985 [Plaintiffs' Memorandum Responding to the Court's Notice] at 8 (filed June 14, 1985).

Quoting the test for a First Amendment infringement of associational rights cited in *Hobson v. Wilson,* 737 F.2d 1 (D.C.Cir. 1984), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985), plaintiffs argue that "the anti-striker provision serves no legitimate government purpose," *id.* at 9, and that "[e]ven assuming *arguendo* that the exclusion of strikers is a legitimate governmental purpose, the broad exclusion of strikers and their households can hardlly [sic] be defended as one which could not be more narrowly accommodated." *Id.* at 10.

The Notice to Counsel filed April 24, 1985, also asked the parties to identify the alternatives available to a striker who wishes to regain food stamp eligibility. In response, plaintiffs proffer proof that both of the alternatives listed by defendant— that the striker return to work or quit his job—effectively require a plaintiff to sever either his union, or his family ties, or both, in order to restore his eligibility and that of his family for food stamps.

As to the alternative that the striker return to work despite the strike, the constitutions of the UAW and the UMWA provide that a member who crosses an authorized picket line is subject to trials and union discipline. Following a hearing, members who cross a picket line can be deprived of membership in the union as well as receive other sanctions. Declaration of Gary Bryner at ¶¶ 5–6 (filed June 3, 1985); Declaration of Marty D. Hudson at ¶ 4 (filed June 3, 1985).

Plaintiffs also proffer proof that the second alternative listed by defendant (quitting his job) means that a worker must sever his association with his union. The striker who quits his job must withdraw from union membership. *See* Declaration of Marty D. Hudson at ¶ 5; UAW Const., art. 17, §§ 2–3. Under the UMWA Constitution, a person who quits and works in a non-union mine can be subjected to discipline. Declaration of Marty D. Hudson at ¶ 6. Under both constitutions at issue in

■■■■■■■■ this case, a member who no longer works under the jurisdiction of the union eventually loses his union membership. UAW Const., art. 5, art. 6, §§ 1–2, art. 17, § 3; UMWA Const., art. 11, § 1. Upon reemployment in a plant under his former union's jurisdiction, the former union member will have to pay a reinstatement or initiation fee. UMWA Const., art. 11, § 4, art. 13, § 1; UAW Const., art. 16, §§ 1, 9, art. 17, § 3.

Plaintiffs also respond to defendant's contention that the alternatives available to a striker to regain food stamp eligibility do not necessarily cause a worker to leave his union because the worker can simply transfer to a different work location:

> The defendant has misconstrued—or misunderstands the meaning of the UAW and Mine Worker constitutional provisions permitting transfers. Defendant's Response at 3. While union membership transfers are permitted, an employee/member must *first* obtain work in a plant or mine under union contract. This is solely up to the employer in an industrial union such as the UAW or Mine Workers, and is practically unlikely in the depressed automobile and coal industries. Thus, there is, in reality, no option for strikers to simply transfer to "work" with another union.

Plaintiffs' Reply Concerning the Court's April 24, 1985 Notice to Counsel at 3 (filed July 10, 1985) (emphasis in original).

Finally, plaintiffs point out that a striker could make his family eligible for food stamps by abandoning it and establishing a separate household. *See* 7 C.F.R. § 273.-1(g)(1) (striker disqualification applies only to household which contains a striker). As

a corollary, the regulation makes clear that some family members could make themselves eligible for food stamps by leaving the striker's household and setting up their own. *Id.* According to plaintiffs, "This alternative poses serious constitutional questions." Plaintiffs' Memorandum Responding to the Court's Notice at 2 n. 1, *citing Moreno*, 413 U.S. at 538, 93 S.Ct. at 2827–28 (Douglas, J., concurring).

### III.

For purposes of the motion to dismiss, it is sufficient to address plaintiffs' first amendment claim in light of the proffered evidence and reasonable inferences therefrom about the effect of the anti-striker provisions upon the associational rights of striking plaintiffs who are otherwise eligible for food stamps. This evidence and these inferences indicate that the statute may threaten the core constitutional right of persons in the position of plaintiffs here to associate with others to let their views be heard, *NAACP v. Alabama, ex rel. Patterson*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), the corollary right of the union to have their association, *Allee v. Medrano*, 416 U.S. 802, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974), and the right of families to associate and live together, *Zablocki v. Redhail*, 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978).

Defendant contends that "since there is no first amendment right to strike, there are no '[first amendment] implications' [of the Food Stamp Act] to take account of." Defendant's Response to Plaintiffs' Supplemental Post-Hearing Brief at 4 (filed March 19, 1985).[12] But what defendant fails to

---

12. As noted by defendant, certain restraints on the union's and on members' constitutional rights are permissible. According to the Supreme Court, a union's right to strike "is more vulnerable to regulation than the right to organize and select representatives for lawful purposes of collective bargaining which this Court has characterized as a 'fundamental right'." *International Union, UAWA v. Wisconsin Employment Relations Board*, 336 U.S. 245, 249, 69 S.Ct. 516, 519, 93 L.Ed. 651 (1949). Striking, however, is generally lawful, the permitted regulation being largely to punish violations of valid

state and federal laws. According to the Court in *Wisconsin Board:*

> "[The] recognition of the 'right to strike' [in the National Labor Relations Act] plainly contemplates a lawful strike,—the exercise of the unquestioned right to quit work," and it did not operate to legalize the sit-down strike, which state law made illegal and state authorities punished. *Labor Board v. Fansteel Corp.,* 306 U.S. 240 [59 S.Ct. 490, 83 L.Ed. 627]. Nor, for example, did it make legal a strike that ran afoul of federal law, *Southern S.S.*

perceive is that it is not simply a union's right to strike which may be threatened by the striker disqualification provision of the Food Stamps Act. Quite apart from any claimed right to strike, the right to join a union, and of a union to promote its lawful interests, is constitutionally protected:

> The first amendment protects the right of all persons to associate together in groups to further their lawful interests.... Such 'protected First Amendment rights flow to unions as well as to their members and organizers.'

*Professional Association of College Educators v. El Paso County Community College*, 730 F.2d 258, 262 (5th Cir.), *cert. denied*, 469 U.S. 881, 105 S.Ct. 248, 83 L.Ed.2d 186 (1984) (footnote omitted), *quoting Allee v. Medrano*, 416 U.S. 802, 819 n. 13, 94 S.Ct. 2191, 2202 n. 13, 40 L.Ed.2d 566 (1974).

Defendant bluntly states the alternatives available to a striker who seeks to regain food stamp eligibility: "return to work or quit his job." Defendant's Response to Questions Nos. 3 and 4 at 3–4. But, plaintiffs are likely to be able to prove that both of the alternatives to striking identified by defendant effectively require a worker to sever his union ties. The evidence proffered thus far indicates that members of the UAW or the UMWA who cross an authorized picket line are subject to trials and union discipline under the unions' respective constitutions. Following a hearing, members who cross a picket line can be deprived of membership in the union as well as receive other sanctions. Declaration of Gary Bryner at ¶¶ 5–6; Declaration of Marty D. Hudson at ¶ 4. Union members who quit employment with the employer with which the union is associated must also forfeit union membership. UAW Const., art. 5, art. 6, §§ 1–2, art. 17, § 3; UMWA Const., art. 11, § 1.

The worker forced to give up his union membership loses numerous incidents of the associational right. The Supreme Court recently noted:

> By resigning, the worker surrenders his right to vote for union officials, to express himself at union meetings, and even participate in determining the amount or use of dues he may be forced to pay under a union security clause.

*Pattern Makers' League of North America, AFL–CIO, et al. v. National Labor Relations Bd., et al.*, 473 U.S. 95, —— n. 18, 105 S.Ct. 3064, 3071–72 n. 18, 87 L.Ed.2d 68 (1985), *citing* Wellington, *Union Fines and Workers' Rights*, 85 Yale L.J. 1022, 1046 (1976); *see also* Declaration of Marty D. Hudson at ¶ 8; UMWA Const., art. 12, § 1; UAW Const., art. 6, § 20.[13] More generally, the individual pressured not to associate loses "a fundamental com-

Co. v. Labor Board, 316 U.S. 31 [62 S.Ct. 886, 86 L.Ed. 1246]; nor one in violation of a contract made pursuant thereto, *Labor Board v. Sands Mng. Co.*, 306 U.S. 332 [59 S.Ct. 508, 83 L.Ed. 682]; nor one creating a national emergency, *United States v. United Mine Workers*, 330 U.S. 258 [67 S.Ct. 677, 91 L.Ed. 884].
336 U.S. at 259–60, 69 S.Ct. at 524–25.

**13.** Although the government may in certain circumstances regulate a union's right to strike, its power over an individual worker's right to associate or not to associate with a union is much more limited. Workers may be required to belong to a union as a condition of employment. But "membership" is limited to paying union dues—a member may not be required to fund political expression by the union if the member objects. *Abood v. Detroit Board of Education*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977). Recently the Supreme Court has fur-

ther circumscribed the permissible interference with individual associational rights which is justified by national labor policy. In *Pattern Makers' League of North America, AFL–CIO, et al. v. National Labor Relations Board, et al.*, 473 U.S. 95, 105 S.Ct. 3064, 87 L.Ed.2d 68 (1985), the Supreme Court extolled the policy of "voluntary unionism" in holding that a union member must be allowed to resign from the organization without penalty even during a strike. (Such a resignation, however, terminates the member's association with his former union and its members. For the applicable provisions for the unions in this case, see UAW Const., art. 5, art. 6, §§ 1–2, art. 17, § 3,; UMWA Const., art. 11, § 1.) Thus, the situation in this case appears to present the "flip" side of the "voluntary unionism" concept enunciated in *Pattern Makers'*. Here it is not the union that seeks to force a member to remain associated. It is the government which seeks to force a member to disassociate.

ponent of [his] personal liberty." *Republican Party of the State of Connecticut v. Tashjian,* 770 F.2d 265, 277 (2d Cir.1985). For, as the Supreme Court recently reiterated:

[O]ne of the foundations of our society is the right of individuals to combine with other persons in pursuit of a common goal by lawful means.

*NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 933, 102 S.Ct. 3409, 3436, 73 L.Ed.2d 1215 (1982).

As an alternative to surrendering the right of union membership, defendant further contends that "workers feeling the pinch of a prolonged strike can pressure their union to reach a settlement." Defendant's Response to Questions Nos. 3 and 4 at 3. But this proposal by the government as a means of establishing eligibility would, in effect, coerce a plaintiff to urge his associates to call off a strike even though this urging be contrary to the merits of the controversy, and the striker's personal opinion about it. According to the Supreme Court in *Abood v. Detroit Board of Education:*

[A]t the heart of the First Amendment is the notion that an individual should be free to believe as he will, and that in a free society one's beliefs should be shaped by his mind and his conscience rather than coerced by the state.

431 U.S. at 234–35, 97 S.Ct. at 1799 (citations omitted). In *Abood,* a State statute sanctioned an "agency shop" provision between a union and an employer which required all employees to contribute an amount of money equal to union dues as a condition of employment. In that case the union used a part of the funds to advance beliefs and opinions with which the plaintiffs did not agree. The Court found a First Amendment violation in this State-compelled expression:

[A] government may not require an individual to relinquish rights guaranteed him by the First Amendment as a condition of public employment.

431 U.S. at 234, 97 S.Ct. at 1799 (citations omitted). Neither should the government require an individual to relinquish constitutional rights in order to obtain food stamps. A statute which pressures an individual to adopt, and in fact advocate to his associates, a position *vis a vis* a strike would appear to transgress this fundamental principle articulated in *Abood:* that an individual's beliefs "should be shaped by his mind and his conscience rather than coerced by the State." *Id.* at 236, 97 S.Ct. at 1800.

As another alternative to sacrificing union membership, plaintiffs point out that because the striker disqualification only applies to households containing a striker, 7 C.F.R. § 273.1(g)(1), a striker can restore his family's food stamp eligibility by leaving his family and setting up a separate household. But, the right to cohabitate with one's family and with relatives beyond one's immediate family is constitutionally-protected. According to the Supreme Court:

This Court has long recognized that freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment.

*Moore v. City of East Cleveland, Ohio,* 431 U.S. 494, 499, 97 S.Ct. 1932, 1935, 52 L.Ed.2d 531 (1977), *quoting Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 639–40, 94 S.Ct. 791, 796, 39 L.Ed.2d 52 (1974). The Court went on:

A host of cases ... have consistently acknowledged a "private realm of family life which the state cannot enter."

*Id., quoting Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944). Moreover, "[t]he freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men." *Zablocki v. Redhail,* 434 U.S. 374, 383, 98 S.Ct. 673, 679, 54 L.Ed.2d 618 (1978), *quoting Loving v. Virginia,* 388 U.S. 1, 12, 87 S.Ct. 1817, 1824, 18 L.Ed.2d 1010 (1967).

The food stamp disqualification provision may thus confront a striker with a complex associational dilemma. Plaintiffs may well establish that in order to make his family eligible for food stamps, a striker may, as a

practical matter, be required either to give up his constitutional right to belong to a union, or his constitutional right to marry, have a family, and cohabitate with his relatives. Any state action having such effect of curtailing the right to associate should be subject to the closest scrutiny. Scrutiny is not limited, as defendant contends,[14] to government actions which directly regulate protected activity. As our Court of Appeals has recently summarized the law in a related context of governmental infringement upon associational rights:

> A line of Supreme Court cases had expressly established ... that lawful associations and their members have the right to be protected from facially legitimate Government actions that would deter membership or otherwise thwart their efforts to associate and petition the Government for redress of their grievances.... [This] principle was not absolute, but made unconstitutional Government action taken for legitimate purposes if it significantly interfered with protected rights of association, unless the Government could demonstrate a substantial ... or compelling ... interest to justify the infringement, and that the interest could not more narrowly be accommodated.

*Hobson v. Wilson*, 737 F.2d at 28 (citations omitted).

The Supreme Court has noted, "It is axiomatic that a complaint should not be dismissed unless 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *McLain v. Real Estate Board of New Orleans, Inc. v. United States*, 444 U.S. 232, 246, 100 S.Ct. 502, 511, 62 L.Ed.2d 441 (1980), *quoting Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). Here, the facts as alleged and proffered indicate that plaintiff may well be able to establish that the amendment at issue significantly inter-

feres with a worker's protected right of association, and that the government has not demonstrated that a substantial or compelling interest justifies the alleged infringement. Consequently, the pleadings here plainly frame unresolved constitutional issues which make dismissal of this action inappropriate. An accompanying Order will deny the motion to dismiss.

### IV.

Plaintiffs' motion for preliminary injunction remains to be considered. It is apparent from the foregoing that once plaintiffs establish the facts proffered about the effects of the anti-striker statute, they may well prevail on the merits of their claim that the anti-striker amendment violates rights guaranteed to plaintiffs by the First Amendment to associate with their families, their unions and fellow union members. It is also likely, however, that if the case were before the Court on the merits, it could very possibly be resolved by a declaratory judgment without resort to any injunction. Plaintiffs have not, however, filed any dispositive motion. It would be more appropriate to address the issue presented in a plenary proceeding on the merits rather than in an interlocutory mode. Accordingly, the accompanying Order will deny, without prejudice,[15] plaintiffs' motion for a preliminary injunction and will set a status call for scheduling disposition of the case on the merits.

### *Appendix A*

Plaintiffs point out, and defendant does not dispute, the differences in treatment accorded strikers under the striker disqualification provision and that accorded other voluntary quitters. Plaintiffs' Supplemental Post-Hearing Brief (filed March 7, 1985). First, the striker provision is indefinite—the striker and his entire household remain disqualified as long as the striker

---

**14.** *See* Defendant's Response to Question Nos. 3 and 4 at 4–5.

**15.** For example, pending a final judgment individual plaintiffs seeking interlocutory relief may

wish to supplement their proof in light of this Memorandum to identify specific violations or threats of violation to that plaintiff's first amendment rights.

remains on strike. 7 C.F.R. § 273.1(g) (1985). All of the plaintiffs in this action have already been disqualified for more than one year. One plaintiff, Mary Berry, has been disqualified for five years. Declaration of Mary Berry at ¶ 5. In contrast, the household of an individual voluntary quitter is disqualified for only 90 days [1], after which food stamp eligibility is restored if the quitter seeks other work and the household remains otherwise eligible. 7 C.F.R. § 273.7(n)(1)(v). Moreover, the original 90 day disqualification does not apply if the individual quitter can show "good cause" for leaving work, and the individual is entitled to a hearing to determine if good cause exists. Good cause includes discrimination by an employer or unreasonable work demands or conditions. 7 C.F.R. § 273.7(n)(3)(i), (ii). There is, however, no such "good cause" provision for a striker. Thus, a striker remains disqualified from food stamps even if the strike were precipitated by discrimination, unreasonable working conditions or any other unfair labor practice. It is undisputed that the employer of plaintiff Berry has been found by an administrative law judge pursuant to a complaint issued by the National Labor Relations Board to be committing unfair labor practices, *see* Declaration of Mary Berry at ¶ 7; yet, Berry remains disqualified because her union refuses to permit its members to work under those conditions.

The striker provision indefinitely disqualifies *all* individuals in the household of a striker. The disqualification includes, for example, an adult child of a striker and the adult child's child, if both reside with the striker. *See* Declaration of Johnie B. Blake

at ¶ 4. A voluntary quitter must be the primary wage earner to disqualify his entire household from food stamps.[2] Even if the quitter is the primary wage earner, as mentioned above, the disqualification only lasts for 90 days. 7 C.F.R. § 273.7(n)(i)(v). No other disqualification provision of the Food Stamp Act indefinitely and automatically extends to the entire household of the disqualified individual. Ineligible student's income or resources are not considered in determining the eligibility or coupon allotment of the remainder of the student's household. 7 C.F.R. § 273.5(3). When a member of a household is found to have committed fraud on the program, his income and resources count in determining household eligibility, but not when determining the coupon allotment of the household. 7 C.F.R. § 273.11(c)(1).[3]

Strikers are also disqualified indefinitely from food stamp eligibility despite any demonstration of their willingness to accept other work. That is, even if a striker actively searches for, or accepts, another job, if he remains on strike, he remains disqualified. *See* Plaintiff's Opposition at 13 & n. 8. Again, the treatment of strikers and other voluntary quitters is different. Voluntary quitters must comply with work registration and job search requirements, 7 C.F.R. § 273.7(a), (e), (f), but once they do, they may receive food stamps despite continued unemployment (immediately, or after 90 days if their quit was without good cause).

Applicant households are also treated differently if they contain a striker as opposed to an individual voluntary quitter. The voluntary quitter provision only applies if the primary wage earner is unemployed at the time of application, and has

---

1. The 90 day provision replaced a 60 day provision on January 2, 1985, and is the one currently in effect. The voluntary quit regulations that were in effect prior to January 2, 1985, are contained in 7 C.F.R. § 273.7(n) (1984).

2. "Primary wage earner" is defined as a household member over the age of 18 who was acquiring the greatest amount of earned financial support for the household at the time of the quit. 7 C.F.R. § 273.7(n)(1)(iv).

3. Defendant professes not to understand the relevance of the treatment of students and those who commit food stamp fraud to the issue in this case—the treatment of strikers. Defendant's Points and Authorities at 15 n. 7. The relevant comparison here is the extent of household disqualification accorded various categories of individuals due to voluntary acts which result in disqualification.

voluntarily quit his most recent job without good cause within 60 days of application. 7 C.F.R. § 273.7(n)(1)(i). Thus, if the voluntary quitter is unemployed or has been employed elsewhere since the voluntary quit, he remains eligible for food stamps. But this is not true of strikers who, even if employed elsewhere, remain ineligible for food stamps because of the blanket disqualification of strikers.

Strikers and voluntary quitters are also treated differently with regard to intervening circumstances which would exempt them from the work registration requirement of the Food Stamp Act. A voluntary quitter who, for example, becomes mentally unfit for employment after quitting, but before application for food stamps, remains eligible. 7 C.F.R. § 273.7(n)(2). A striker in the same situation, however, becomes disqualified. 7 C.F.R. § 273.1(g)(1).

To regain food stamp eligibility, a striker must "either return to work or quit his job." Defendant's Response to Question # 1. The striker provision thus pressures a striker to work at a struck plant. The second proviso to the amendment, however, makes clear that a household of any individual other than a striker will not be disqualified "if any of its members refuses to accept employment at a plant or site because of a strike or lockout." 7 U.S.C. § 2015(d)(3).

Finally, the striker provision applies without regard to the voluntariness of the strike. Not every union member votes for a strike, but all members are nevertheless bound by the majority vote. Strikes may often be caused or prolonged by an employer. *See* H.Rep. No. 464, 95th Cong., 1st Sess. 129–130 (June 24, 1977), U.S.Code Cong. & Admin.News 1977, pp. 2098–2100.

Even if the employer refuses the employee's unconditional offer to return to work, the disqualification continues. *See* Affidavit of Samuel F. Casazza at ¶ 5.[4] Involuntary quitters, in contrast, can show "good cause" for their quit to demonstrate that their unemployment is not voluntary, 7 C.F.R. § 273.7(n)(3), and must merely show a willingness to accept other work to remain eligible for food stamps. 7 C.F.R. § 273.7(a), (e), (f).

---

**4.** The parties dispute whether when a striker is permanently replaced by his employer the disqualification continues. Defendant argues that a striker who has been permanently replaced is eligible for food stamp benefits because "presumably such an individual has no job to return to." Defendant's Points and Authorities at 16; *see also* Food Stamp Program Policy Memo (Nov. 15, 1983) [Defendant's Exhibit A]. But the facts as alleged in this case indicate that as a practical matter, the rule is sometimes otherwise. Supplemental Declaration of Johnie B. Blake at ¶ 10; Declaration of Ray Westfall at ¶ 2. This policy is not reflected in certain state food stamp agency manuals. *See* Exhibits 2–4 to Plaintiff's Supplementary Post-Hearing Brief. Neither was the policy reflected in the notices of disqualification received by two plaintiffs in this action, Berry and Blake. *See* Exhibit 5 to Plaintiffs' Supplemental Post-Hearing Brief.